### WILLIS v. THE STATE.

1. There was no error in refusing or failing to charge the jury upon the law of involuntary manslaughter in the commission of a lawful act, there being nothing in the evidence or the prisoner's statement necessarily requiring such a charge, and the judge having fully instructed the jury that if the homicide was the result of accident, misfortune or misadventure, the accused should not be convicted of any offence.

2. Where one who has killed another surrenders himself to an arresting officer, the fact that the latter told the prisoner that giving himself up was the best course he could pursue, did not render inadmissible confessions then made to the officer, it appearing that they were free and voluntary, and that the officer neither said nor did anything other than as above mentioned, before the confessions were made. Under these circumstances, the rights of the prisoner in this respect were fully guarded by submitting to the jury, under proper instructions, the question whether the confessions were free and voluntary, and leaving them to determine whether the confessions should or should not be considered.

3. The lengthy extract from the charge of the court, of which complaint is made, contained many correct and applicable rules of law, and if erroneous in any respect, the error was not distinctly pointed out and designated.

4. There was nothing in the newly discovered evidence to require or even authorize the granting of a new trial. The evidence warranted the verdict and there was no error in refusing to set it aside.                                          *Judgment affirmed.*

January 27, 1894.

Indictment for murder. Before Judge BARTLETT. Terrell superior court. May term, 1893.

Homer Willis was tried for the murder of George Outlaw, and was found guilty of voluntary manslaugh-

ter. A new trial was granted by the Supreme Court
(89 *Ga.* 188), and it took place about two years after
the first trial. Defendant was again found guilty of
voluntary manslaughter, and his motion for a new trial
was overruled, to which he excepted. He was a boy
lacking six days of being fourteen years old, according
to the testimony of several witnesses; according to that
of his parents and others, he was not so old by a year.
He and the deceased were cousins, and were nephews of
Gill Willis, at whose house deceased lived, defendant
being there on a visit from Texas. In the afternoon of
the day of the killing, defendant went into a room where
two young women, Misses Lizzie and Ella Kenney,
were sitting, jumping suddenly into the door and start-
ling them. One of them jokingly proposed that they
whip him, and thereupon ensued playful scuffling and
chasing, which continued for some time, the parties
going out upon the porch and into the yard. The play-
ing or joking was kept up, and it grew more and more
rough until it reached the point of quarrelling. Finally
the defendant took hold of the arm of Miss Ella Kenney
and started down the road with her. She began to cry,
and he released her. They returned to the house, she
remarking that he was as mean as the dickens. One of
the girls threatened to make George Outlaw hold de-
fendant for them to whip. Both of them went to the
fence surrounding the field where George Outlaw was
ploughing, but did not see him. They returned to the
piazza, and defendant went into a room of the house,
locking himself in. One of the girls testified that she
heard a noise as of the clicking of a gun proceeding
from the room. He soon came from the room with a
gun in his hands, and the girls asked him to put it up,
and he placed it in the rack in the hall, returned to the
piazza and took a seat. It seems that the rough joking
or quarrelling continued until George Outlaw returned

v 93–14

from his work, and as he came into the yard he was told by one of the girls to come and see if he couldn't make defendant behave himself—he said he had a gun laid up for somebody. Defendant said, "If you hold me for them to whip me, I have got it laid up for you." To this George replied, "Don't you say nothing about taking a gun to me until I say I am going to hold you." One of the girls told defendant to hush, he was nothing but a gas-bag; to which he replied, that if she did not mind he would explode and blow her up. The girls went into the house, and George Outlaw went to put up his mule. Defendant went into the kitchen, sat down and commenced crying. He said to the servants that if they wanted to get out safely they had better get out now, because he was "going to turn up hell here to-night." He seemed to be mad. He made one of the servants give him a knife with which he proceeded to make a paddle, saying he made it to paddle Miss Lizzie with. One of the girls (Miss Ella) came into the kitchen, and he begged her pardon, saying he would not wound her feelings for anything, and asked her to go to Miss Lizzie, who was in the parlor, and beg her pardon for him, which message she delivered, Miss Lizzie making no reply. Miss Ella told defendant that she was angry for only a minute. Soon George Outlaw came into the kitchen and ordered defendant to go out of there, saying, "Uncle Gill told you a night or two ago about going in here with these women while they were cooking, and I want you to go out of here." Defendant refused to go, and again refused on a repetition of the order. About that time defendant "got up out of the door," and Outlaw said, "You come on out of this kitchen," and defendant replied, "I am not going to do it until hell freezes over." They commenced drawing towards each other, defendant holding a butcher-knife. Outlaw grabbed him by the shoulder and said, "You take a knife to cut me with, and I will shake you

all to pieces." They took hold of each other and commenced scuffling, going out upon the piazza and continuing to shake each other. They were separated by the cook who was told by each of them to make the other let him alone. Defendant went into the hall and took a seat, and soon supper was announced. Outlaw and the two girls went and took seats at the supper-table, and defendant went to the front of the house, took up the gun before mentioned, and blew out two lights. One of the girls exclaimed at this, and told Outlaw that defendant was going to shoot. Outlaw rose, went to the dining-room door and closed it, telling the girls to look out. He also asked defendant what he meant, and said he would not draw a gun on the ladies. The girls and servants hurriedly left the house from the rear, and had gone but a few steps when they heard the gun fire. Outlaw was shortly afterwards found lying in the dining-room by the door which was swinging open. He was shot in the face. According to defendant's statement, and the testimony of a witness who claimed to have been sitting in a buggy in the road in front of the house, defendant was grievously and unjustifiably assaulted and beaten, as well as cursed, abused and threatened by Outlaw before supper, Outlaw telling him he would tie him with a rope and put him in an outhouse to stay all night; that he would tie and conquer him or kill him, etc.; and at the time the gun fired, Outlaw was advancing on defendant, apparently with the purpose of carrying his threat into execution, when defendant took the gun from the rack, holding it in his hands, not elevated to his shoulder. He did not know how it came to fire ; he did not think he pulled the trigger. Defendant's witness was contradicted as to several material points, it appearing among other things, from the State's testimony, that the front door, which was solid without glass or side-lights, was closed all during the encounter; that

no one could have seen from the road in front; and that no rope was brought or ordered by Outlaw to be brought, as this witness testified. Defendant was smaller and lighter than Outlaw, some witnesses estimating his weight to be as low as 80 or 90 pounds, and other testimony tending to show that he weighed 115 or 120 pounds. Outlaw weighed about 150 pounds, and was 20 years of age. He was in charge of the premises in the absence of his uncle. J. C. Savage testified that on the night of the killing, between eight and nine o'clock, defendant approached him in Dawson (he being the policeman of the town), and said, "I have killed a man, and have come to give myself up." Savage replied, that he thought that was the best course defendant could pursue, or that he had acted properly, or had taken the proper course,—something like that in substance. Defendant had no hat on his head, and was excited, though endeavoring to appear cool. He had already asked Savage if he were an officer. Savage asked him where he had killed the man, and he proceeded to inform Savage, in answer to this and further questions, that he had killed George Outlaw who was his first cousin; that the reason he killed him was, that Outlaw was jerking, cuffing and kicking him about in a way that he did not like, and he shot him; that when he shot, Outlaw was standing just inside of the dining-room door and stuck his head out, and he shot him; that the first time Outlaw poked his head out from behind the door he pointed his gun towards where his head came out, and when he stuck his head out the second time he was ready and pulled down; that Outlaw told him he was going to hold him for the girls to whip him when he finished his supper, and he told Outlaw if he did he would shoot him; that he got the gun and got outside, and Outlaw poked his head outside of the door and told him he would swallow all the bullets he could shoot, and he stuck his

head out the second time, and when he did he shot him; that he reckoned he had killed him; that he left his hat where he did the killing, and the reason he did not want to go in and get it was that he was afraid; that he did not care a damn if he had killed him; and that if he had been in Texas he would have acted differently, would have stopped at the first negro house and wrapped paper around his feet so that the dogs could not run him, and would have gone to the frontiers, but there were so many bloodhounds in this country that he might have wandered around for three or four days but they would have caught him. When Savage told him he would have to put him in jail until the next morning when his friends could come and give bail for him, he he remarked that he did not think it was a bailable case. He approached Savage voluntarily. Savage was not acquainted with him before, and offered him no inducement to make the admissions he made, unless asking questions and stating that his coming to give himself up was the best thing he could have done, was such inducement.

The grounds of the motion for a new trial, besides those alleging that the verdict is contrary to law and evidence, are, that the court erred in refusing to charge the jury the law as to involuntary manslaughter in the commission of a lawful act without due caution and circumspection; and in allowing witness Savage to testify as to confessions made to him by defendant on the night of the homicide, over defendant's objection that said confession was induced by hope of benefit; and that the court erred in charging the jury as follows: "Now you determine from the evidence, if the defendant killed the deceased, whether he intended to do so or not. If he did not intend to do so, why then inquire whether he would be guilty of involuntary manslaughter, because involuntary manslaughter is that

kind of manslaughter where there is no intention to kill. Right here I charge you, if there was a killing by accident, a person shall not be found guilty of any crime or misdemeanor committed by misfortune or accident, and where it satisfactorily appears there was no evil design or intention or culpable neglect. Now, to point a loaded gun or an unloaded gun at a man in fun is unlawful, and if a killing occurs in that way, an unintentional killing, that would be involuntary manslaughter in the commission of an unlawful act. In arriving at a conclusion whether the defendant is guilty of involuntary manslaughter, the jury should remember that if such a killing take place in the commission of an unlawful act which in its consequences naturally tended to destroy human life, why, it would not be involuntary manslaughter but would be murder. A man cannot do anything or put in motion a dangerous weapon which would ordinarily tend to destroy human life, and be excused because he did not intend to kill anybody. If the natural tendency of the act is to destroy human life, it would not be involuntary manslaughter, or if it is done in the prosecution of a crime punishable by death or confinement in the penitentiary. Of course, if the killing was done by accident or misfortune, it would be no crime at all, and you would not be authorized to convict him. Inquire whether it was involuntary manslaughter or not. See how it was done. Did he point the gun at the deceased, and did he fire intentionally? If he pointed the gun at him, assaulted him with the weapon, intended to kill him, and while then assaulting him, having the gun pointed at him for the purpose of killing him, and the gun went off, whether by his consent or accident, it would be murder or voluntary manslaughter, according as to whether you determine the shooting was done with malice or in passion." Defendant insists that this gave to the jury abstract principles

of law that, under the evidence for the defendant, were not applicable to the case; that it was too favorable to the State, and did not present his theory as to his right of self-defence against the assaults and battery of deceased; and that it led the jury to believe that, although he had been assaulted and beaten, he had no right to have the gun, nor to present it at deceased in order to protect himself from further violence.

The motion also contains a ground setting up newly discovered testimony tending to contradict a witness for the State as to the front door of the house being open when said witness and the two affiants who contradicted him reached the house shortly after the killing, and as to other points of less materiality. These affidavits were met by rebutting affidavits on the part of the State, tending to support the evidence introduced at the trial. No showing as to diligence was made in connection with this newly discovered evidence.

J. W. WALTERS and J. A. LAING, by HARRISON & PEEPLES, for plaintiff in error.

J. M. TERRELL, attorney-general, H. C. SHEFFIELD, solicitor-general, and HOYL & PARKS, contra.