## FULLER v. THE STATE.

</div>

1. An incriminating admission is not necessarily, as matter of law, to be treated as involuntary because made by a prisoner confined in jail to the sheriff under such circumstances as the following: The officer had caused the prisoner and his cell-mate to be brought into the office of the jail, when the latter said to the former, "Tell [the sheriff] what you said to me last night." Thereupon the officer said, "Yes, let me hear what you have got to say." The admission was then made, and as to it the officer testified that it was not induced by any hope of benefit or fear of injury.

2. While a wife, save as expressly provided by statute, is not a competent witness for or against her husband when he is on trial for a criminal offense, a married woman is not rendered incompetent to testify on the trial of one, not her husband, because the latter may be in jail "under a commitment warrant charging him with" the identical offense for which the other is being tried.

3. The evidence was sufficient to sustain the verdict.

<div align="center">Argued February 5, — Decided February 26, 1900.</div>

Indictment for murder. Before Judge Felton. Bibb superior court. January 3, 1900.

*Claud Estes, N. E. Harris,* and *Washington Dessau,* for plaintiff in error.  *J. M. Terrell, attorney-general,* and *Robert Hodges, solicitor-general,* contra.

LEWIS, J. Allen Fuller was indicted, tried, and found guilty, in Bibb superior court, under an indictment charging him with the murder of Mrs. Eugenia Hamilton Pottle, alleged to have been committed in that county on November 20, 1899; whereupon he made a motion for a new trial, which was overruled by the judge below, and upon this ruling he assigns error in his bill of exceptions.

1. Among the grounds in the motion for a new trial is alleged error in the court allowing, over objections of defendant's counsel, G. S. Westcott, sheriff of Bibb county, when being examined as a witness for the State, to testify substantially as follows: Witness saw Allen Fuller for the first time in the office of the county jail, Thursday before the body of deceased was found. He had a conversation with defendant, on information received from a fellow-prisoner by the name of Lowe, who slept with defendant the night before. At the conversation there were present Lowe and deputy-sheriff Herrington. Witness had Allen Fuller brought into his office in the jail, and Lowe told the defendant to tell witness what he told him (Lowe) the night before. Neither witness nor Herrington nor any one offered any inducement to defendant for him to make a statement. Lowe said to defendant, "Tell Mr. Westcott what you said to me last night." Witness remarked, "Yes, let me hear what you have got to say." Herrington said nothing. The next person who spoke was Allen Fuller. Nothing was done or said to him by any one more than what has been stated. Fuller stated, in substance, that he wanted to tell who had killed Mrs. Pottle; that he had nothing to do with it. Witness then asked him who did the killing; and he replied, a negro by the name of Redd, who was then in jail, had done the killing. Witness asked him how he knew it. He answered, because Redd had told him so. Witness then asked him how came Redd to tell him so; and he replied: Redd came to him on a previous occasion, and wanted him to go with him and kill Mrs. Pottle; that he would get $200.00 for doing the deed, and

that if defendant would help him he would divide the money with him. Defendant stated that he refused to do it, and had nothing to do with it. On the next day after Mrs. Pottle disappeared, defendant stated, Redd came to him, and told him, "I got her last night." He told him he had killed her, and said, "Keep your mouth shut about what has passed between us, and you will get what I promised you." Witness then asked defendant if Redd told him how he killed her. Defendant replied: "He told me she come to his house and wanted him to go home with her, and that he didn't like her no way, that she owed him for some corn she borrowed from him; and he said that he consented to go, and went out in the yard and got the axe and taken the blade off and sorter held it under the arm or coat, and made it appear as if he was walking with a walking-stick, and led her to the side of the little hill near the house, and as he was going down the hill he knocked her down with the axe, and she hollowed one time and he struck her four or five blows." Witness then asked the defendant if Redd told him what he did with the body. He replied, yes, he did; that he took the body, carried it behind his house to a little charcoal-kiln, chopped her up and burned her up, and said, speaking to defendant, "If you will look about there you will find her or some of her remains." Redd said he had a fire for several days, and, if he had not got it plowed over, you will find where he burnt her up.

It is contended by counsel for plaintiff in error that this testimony should not have been admitted under the circumstances set forth in the motion for a new trial, and substantially given above, for the reason that this conversation, or incriminating statement by the defendant, was not freely and voluntarily made. There is no question about the statement of the defendant admitted in evidence not being a confession. It was, on the contrary, an exculpatory statement in which the defendant evidently sought to place the crime on another, and insist upon his own innocence of any particular crime. It is introduced, however, by the State as a circumstance, taken in connection with other facts proved, which tended to incriminate the prisoner. We think the sounder view of the law touching the ad-

missibility of such declarations on the part of one charged with crime is to exclude them, if not voluntarily made, upon the same principle as the defendant's statement would be excluded if it amounted to a direct confession of guilt. But it is not necessary to decide directly this question, or to undertake to reconcile authorities, or determine the weight of authority upon the subject; for under the facts of this case, we think there is nothing in the record which indicates that this statement of the defendant was not freely and voluntarily made to the sheriff, without being induced by any hope of reward, or fear of punishment; or that the will of the defendant was to any degree coerced, or unduly persuaded. It is true this court has, in its adjudications upon the subject, attempted to impress upon sheriffs and other officers the gross impropriety of improperly obtaining confessions from prisoners in their custody; but there is nothing in the law, or in any of the decisions of this court or any court of last resort, of which we are aware, which would exclude a confession or an incriminating statement made to an officer simply because the prisoner was in his custody under arrest at the time. In the case of *Smith* v. *State*, 88 *Ga.* 627, it was decided that a self-criminating admission made to the sheriff by a prisoner in jail, in response to the sheriff's admonition in these terms: "You know you are the man; they got your cap, and you might as well own up," is of doubtful admissibility. The court did not grant a new trial in that case, because the other evidence showed the defendant's guilt beyond question; but the point we make on the decision is, that if in that case the confession made under the circumstances narrated was only of "doubtful admissibility," we can not see that there can be any possible doubt about the admissibility of the evidence objected to in this case. Here, it will be noted, the sheriff received information from another prisoner of a statement made by this defendant, inculpating another person as the guilty party, and simply remarked to him, "Yes, let me hear what you have got to say." We see nothing improper in the sheriff's conduct. He had received information that this defendant would relate facts to show the guilt of another party, and doubtless had no idea whatever of getting from him anything like a

confession of guilt; and he did receive simply the information that he evidently expected. There was really nothing more in this statement made by the sheriff tending to incriminate the defendant, if as much, than the statement the defendant himself made before the jury on his trial. This is not near as strong a case for excluding the statement of the defendant as *Miller* v. *State*, 94 *Ga.* 1, where it was held: "That a fellow-prisoner in jail with the accused, who was charged with murder, asked him about the killing and 'told him he better tell the truth, the white folks were going to break somebody's neck,' did not, as matter of absolute law, render inadmissible confessions then and there made in the presence and hearing of fellow-prisoners only." Nor do we think it as strong a case as *Willis* v. *State*, 93 *Ga.* 208, where it was held: "Where one who has killed another surrenders himself to an arresting officer, the fact that the latter told the prisoner that giving himself up was the best course he could pursue did not render inadmissible confessions then made to the officer, it appearing that they were free and voluntary, and that the officer neither said nor did anything, other than as above mentioned, before the confessions were made."

But the case relied upon by counsel for plaintiff in error is Bram *v.* United States, 168 U. S. 532. By reading a report of the facts in that case, it will be seen they were entirely different from what the record in the case at bar presents. That was an indictment for murder alleged to have been committed on an American vessel on the high seas. On arrival at Halifax, a policeman and detective in the government service at that place had a conversation with defendant, who was indicted at Boston for the commission of the crime. The prisoner had been brought to the office of the policeman, where he stripped the defendant, examined his clothing, told him to submit to an examination, and searched him. Defendant was then in custody, and did everything the witness directed him to do. When defendant came into the policeman's office, the officer said to him, "We are trying to unravel this horrible mystery. . . Your position is rather an awkward one. I have had Brown in this office, and he made a statement that he saw you do the murder." In the course of the conversation, he further told de-

fendant: "Now, look here, Bram, I am satisfied that you killed the Captain, from all I have heard from Mr. Brown. But some of us here think you could not have done all that crime alone. If you had an accomplice you should say so, and not have the blame of this terrible crime on your own shoulders." The prisoner replied: "Well, I think, and many others on board the ship think, that Brown is the murderer; but I don't know anything about it." He was rather short in his replies. A recital of the facts will show without argument the vast difference between the circumstances under which the defendant in that case made his statement, and those disclosed by the record in this case. The conversation of the officer himself was calculated to impress upon the mind of the defendant the importance of his telling about an accomplice, if he had any, and the fear of having the blame of the horrible crime on his own shoulders. It will be noted, however, in that case that notwithstanding these facts, which might with reason be said to create in the mind of the prisoner some hope that a statement from him about another's guilt would be of some advantage to him, three of the Justices, to wit, Justice Brewer, Chief Justice Fuller, and Justice Brown, dissented, holding that under the facts, the statement of the prisoner was admissible. We conclude that the court below did right in overruling the objection to this evidence; and there being no complaint made of the charge to the jury on the subject, the presumption is the judge fairly and fully instructed them on the law touching this issue; and the evidence was sufficiently strong to submit to the jury, for its determination, the question as to whether the statement made by the defendant was free and voluntary.

2. Another ground in the motion for a new trial is, that the court erred in refusing to rule out the testimony of Anna Redd, a witness for the State, which motion was made by defendant's counsel before the conclusion of the case to the jury, it being substantially as follows: She was the wife of Alfred Redd. The night her husband went to see Woolfolk up at the old Small place, there didn't anything happen at her house. Redd went to George's house and came back home, and witness heard Mrs. Pottle's voice three times. She called him three times,

and asked him was he in bed, and he said, "Yes, ma'am"; and that was all she heard of her at all. The voice seemed like it was at the ginhouse, a short distance from her house. Witness's husband was in bed with her when she heard the voice; and she supposed it was a quarter of an hour after her husband came in the house when they heard Mrs. Pottle's voice. She further stated she knew Allen Fuller; saw him the day he was arrested. He came to her house the day before that, and saw Redd, her husband. It appears from the evidence that this man Redd was the person whom Fuller, the defendant, tried to incriminate in his statement to the sheriff. It was contended by counsel for plaintiff in error that, Redd being also under indictment for the murder of Mrs. Pottle, the testimony of his wife was introduced to corroborate him, and was therefore inadmissible. There was not even a joint indictment in this case against this defendant and Redd, but separate indictments against each. In the case of *Williams* v. *State*, 69 *Ga.* 13, this court decided: "The restriction of a wife's testimony in a criminal case is confined to giving testimony on issues involving the guilt of her husband. Although he may be indicted jointly with others, yet on the several trial of one of the others she may testify as to matters not affecting his guilt or innocence." In the opinion on page 30, the case of *Stewart* v. *State*, 58 *Ga.* 577, is cited, where it was ruled that a wife might corroborate her husband though an accomplice and indited for the same offense, — the issue being the innocence or guilt of another than her husband. In *Whitlow* v. *State*, 74 *Ga.* 819 (2), it was held: "The wife of one of two persons charged with a crime may testify against the other, he being severally and separately tried. The State could sever on the trial for the very purpose of introducing her testimony." These decisions, and authorities cited, necessarily control this question; and the court committed no error in refusing the motion to rule out this woman's testimony.

3. The only other ground to be considered is the general one, that the verdict is contrary to law and the evidence. There is quite a volume of evidence in the record; but the main testimony relied upon for a conviction we will undertake to give,

as it was very earnestly argued that, the testimony being purely circumstantial, it did not authorize a conviction. It appears that the deceased was last seen alive on the night of November 20, 1899, while walking on the public road leading from Macon to Clinton, in Jones county. She was seen by several witnesses after dark, from 6.30 to 8 o'clock. The last person seen in her company on this road was Allen Fuller, the accused. Several witnesses saw them on the road, some of them locating him a very few feet behind the deceased. There was evidence of a clot of blood having been found in this road. The witness Redd, who was also arrested for this murder, testified that he saw deceased that night passing by or near his house in the road, with Fuller a few feet from her, following her. She seemed to indicate some fear of defendant Fuller, and asked Redd if he knew this man. Redd assured her that "he was a neighborhood man, and would not hurt her at all." She then went on walking slowly along the road towards Clinton, it appearing that road was in the direction of her house in Jones county, some few miles distant. Redd said he went into his house, went to bed, and some few minutes thereafter he recognized Mrs. Pottle's voice calling for him. He answered. She asked him if he had gone to bed. He replied in the affirmative. He then turned over and went to sleep. Mrs. Pottle was not seen afterwards until about December 7, 1899, when her body was found floating in the Ocmulgee river. The body was identified by witnesses. There was evidence showing several blows made upon her head, supposed to be by a stick or bludgeon. The river was about a mile or a mile and a half from where the blood in the road was found. There was testimony showing that the defendant, Fuller, had a father-in-law living on or near this road, with whom his wife was staying, and that he often went to his house. Mrs. Pottle had in her hands, on the night she is alleged to have been killed, a small hand-satchel. Fuller, shortly before his arrest, carried his household goods, including two valises, to the house of one Lucas, and deposited them in a room. A day or two after his arrest, witnesses inspected this property of the defendant, and in one of the valises was found a small hand-satchel, which was

identified as the property of Mrs. Pottle that she had on the day she is alleged to have been killed.

These witnesses further testified that the house, when they got to it, was not occupied, was open, and anybody could have had access into it. In that satchel was also found a pair of scissors, the testimony indicating they were very similar to those owned by the deceased. We have hereinbefore given the statement made by defendant to the sheriff. After this it seems search was made for the body claimed to have been burned, but no sign of such burning was found. The body was found in the river. The sheriff had another interview with the defendant Fuller, and told him that he had misled him, and that defendant had not told the truth; that Mrs. Pottle's body was not where he said it was; that they looked everywhere. Then defendant stated, they had plowed over the place, and Redd certainly told him he put it there, and it was there somewhere, certain. The sheriff remarked, "You sent me off on a wild-goose chase; she is not there," and then told defendant they had found Mrs. Pottle's body about three miles up the river, designating the place in the river where it was found. Defendant then admitted that he did not tell the truth, but stated he would then tell it. In this statement defendant said, he was coming up the road and overtook Redd and Mrs. Pottle. As he was passing, Redd spoke to him in a whisper, and told him, "I am going to kill her to-night, and you come and go with me; if you do, I will pay you for it." He said, "We went on up the road away up about the ginhouse somewhere, and Redd a little bit behind her with an axe in his hand, and before I knowed it Redd struck her from behind with the axe one blow, and that knocked her to the ground, and he repeatedly struck her again, and she screamed and hollered." Redd then took her up and put her on his shoulder, the defendant going with him, carried her to the river, resting one time only, and threw her body into the river. The evidence showed that the deceased only weighed about ninety-three pounds. The next day the sheriff had a conversation with the defendant about the hand-satchel. At that time it had not been found; and he asked him about the hand-satchel. He said, "Yes, she

did" have the satchel; it was not thrown in the river; that when Redd knocked her down she dropped it; and when defendant and Redd came back from the river, he wanted to go and get it, and Redd picked it up; that defendant had nothing to do with the satchel, and Redd carried it off. After the satchel was found in defendant's valise, the sheriff again asked him about it. Defendant remarked: "If you did find it there, Redd put it there." Defendant stated that he had nothing to do with it. One witness for the State testified that while they were hunting for the body of Mrs. Pottle he and Mr. Dodd met defendant Fuller, who asked him if he had heard or seen anything of Miss Genie (meaning Mrs. Pottle). Witness said, "No, I have not yet. I wish you gentlemen could find her." Then defendant told witness to get a crowd of men and go and ramble the woods and help look for her, so she could be found; and, after Mr. Dodd left, defendant said to the witness: "You are a damn fool, what business have you got looking for Miss Genie? She is a white woman; let the whites look for her."

The defendant made the following statement: "I was going on home one night, one Monday night, from town. I had been to town at work on Monday, and I was going home from town, and I got up there in the road against old man Redd's house, and Mrs. Pottle and old man Redd was standing in the road talking, or right at the edge of it, and I walked right by them, and old man Redd says, 'Who is that?' and I says, 'It is Fuller,' and he says, 'Hold on a minute, Fuller, and go up the road with me a piece. I am coming right back. I have got some particular business to talk to you'; and I went on with him, and Mrs. Pottle turned around and says, 'Is you going a piece the way with me, Redd?' and he says, 'Yes,' and he turned around and went right on, and me and him and her went on up the road together, and we got such a distance, and he hit her with a stick, and she fell and hollered, and I hollered too, and says, 'What are you doing?' and he jumped around to me, and he says, 'Shut up, you are just as much into this as I am,' and he says, 'If you make any talk about this at all, they will break your neck as quick as they will mine,' and I was naturally scared to tell it to anybody, because I was with

him when he did it, and I didn't know what to do, and I didn't tell it to any one. There is nothing else that I desire to say, no more than I reckon that is all I have to say about it."

In the light of this evidence, we can not say that the jury were not authorized to draw the conclusion that the defendant's guilt was proved beyond a reasonable doubt, and to the exclusion of every other reasonable hypothesis. The verdict having been approved by the trial judge, we will not interfere with his discretion in overruling the motion for a new trial.

*Judgment affirmed.　All the Justices concurring.*