THE STATE OF WYOMING
*Plaintiff and Respondent*

vs.

VIRGINIA M. JONES,
*Defendant and Appellant.*

(No. 2626; November 16th, 1954; 276 Pac. (2d) 445)

For the defendant and appellant, the cause was submitted upon the brief of Moran and Murphy of Riverton, Wyoming, and oral argument by R. Lauren Moran.

For the plaintiff and respondent, the cause was submitted upon the brief of Howard B. Black, Attorney General of the State of Wyoming, of Cheyenne, Wyoming, and Chester B. Ingle, County and Prosecuting Attorney, Hot Springs County, of Thermopolis, Wyoming, and oral argument by Mr. Ingle.

124

## OPINION

RINER, Justice:

This cause is here from the District Court of Hot Springs County by direct appeal to review a judgment of that Court rendered on the verdict of a jury. The appellant and defendant, Virginia M. Jones, was, by said verdict, found guilty of the crime of manslaughter —which was charged by the county attorney of that County by an information alleging, as concerns the

offense involved, that the defendant, Virginia M. Jones, "on the 30th day of March 1953 in the county of Hot Springs, in the State of Wyoming, didwilfully, unlawfully, feloniously, and voluntarily, upon a sudden heat of passion, then and there, kill a human being, to-wit, Andrew R. Jones."

The facts involved in this prosecution are substantially these: Andrew R. Jones died as a result of a gunshot wound inflicted by a .22 caliber rifle held in the hands of Virginia M. Jones, his wife, on March 30, 1953, between the hours of eight and ten o'clock in the morning of that day, under the circumstances hereinafter detailed. These parties were between twenty and thirty years of age. They were married in San Diego, California, on December 26, 1947; Jones was at that time in the naval service of the United States. They had lived in the city last mentioned for about five months as husband and wife when Jones went out of the service without leave. He was apprehended, brought back to California, tried for his offense (AWOL) before a military tribunal, and sentenced to a term in Mare Island naval prison. After completing his prison sentence, he was not discharged but was retained in active duty and sent to Honolulu, Hawaii. His wife followed him there about a month later; and they lived in that city until September, 1949. After that they returned to the mainland, staying in Oakland, California, for some time. Thereafter, they moved from place to place in Wyoming and adjoining state —Jones obtaining employment as a laborer and finally working as a roustabout in the oil fields of this State. They moved to Grass Creek, Wyoming, in November, 1952, where they continued to live until March 30, 1953. Jones was then in the employ of the Ohio Oil Company. As husband and wife, Mr. and Mrs. Jones lived in that place in a trailer camp and in a trailer

house owned by them and located by them on ground which was the property of the oil company above-named. There are no children of this marriage.

During the first few months of their marriage, the parties appeared to have lived together with a reasonable degree of harmony. After Jones' release from the naval prison, his character seems to have changed radically. He began drinking heavily and brutally abusing his wife. He left her at times and went off with other women; he would be gone on these occasions for some time. His wife threatened divorce proceedings, but eventually the parties became reconciled. Defendant was a woman weighing about one hundred pounds, but Jones was a muscular man about six feet in height and weighed approximately two hundred pounds. Neighbors noticed the harsh treatment Jones gave his wife and remonstrated with him concerning this conduct; although he expressed regret and promised not to do so in the future, these promises he never kept. In middle or late February, 1953, he struck her with his fist, splitting her lip, and loosening her teeth to such an extent that they all had to be removed and artificial dentures installed. On this occasion he broke her glasses and inflicted numerous other marks and bruises upon her. This trouble became known to several of the neighbors at the trailer camp.

On Saturday, March 28, 1953, Jones was working on an evening shift or tower on an oil rig from four o'clock in the afternoon until twelve midnight. That day he took some food in a lunch box, telling the defendant that he was going to work; but about an hour and a half later, Mrs. Jones learned that he had not gone to work. Finding that their car was gone, she obtained a ride to Thermopolis, a nearby town. There she found their car at a cabin camp, without gasoline, and with the rotary distributor on the motor missing.

She had notified the sheriff of Hot Springs County of the car's disappearance; and when the car had been found, she sought his aid in getting its motor running. She then returned to the trailer house in Grass Creek. Her husband did not return home that night. The next morning she again went to Thermopolis and met Mr. Jones riding with one Randall toward Grass Creek. Jones then left Randall and got in the car with his wife, and they returned to their trailer home. The quarreled repeatedly during the trip home and the rest of the day. Jones told her he was leaving her and going with a woman who was waiting for him in Thermopolis. During that day, he again struck and beat her. However, at his request, they returned to Thermopolis in the car, got his clothes from Randall's automobile, and put them in their car. During the course of this journey home, he once more struck and beat her. That evening they returned to the trailer house and spent the night there. Mrs. Jones took the car keys out of his pocket and hid them. When he found what she had done in taking these keys, he became very angry. About six-thirty in the morning, he told her he was not going to work but intended to leave. She pleaded with him to change his mind; about seven-thirty that morning, he again informed her that the other woman was waiting for him in Thermopolis and that he was going to her even if he had to kill Mrs. Jones to do that. A short time later, he got a number of rifle shells from an egg crate. She also got a few shells which, as she says, she "grabbed" at the time he seized those which he took—she got nine to twelve shells. When she grabbed these, he caught her around the neck and choked her until she fell to the floor. When he allowed her to rise, she left the trailer (although he tried to prevent her doing so, she eluded him) and went to the car where the .22 caliber automatic rifle was kept. He tried to prevent her getting the weapon; he was

immediately behind her and reaching for the gun. Her sister and a neighbor, Mrs. Turner, were close by, watching this struggle. Her sister then asked them to quit fighting. Mrs. Jones then said she secured the gun so Jones would not hurt her any more. She put three shells in the gun clip; she was badly scared, she testfied. When her sister and the neighbor woman appeared, Jones retired into the trailer home. Mrs. Jones came to the door and opened it. She never held the gun to her shoulder. At that time, Jones was sitting on the couch; and she was standing on the ground outside the door. When he saw her, he got up and started toward her. As stated above, she never brought the gun to her shoulder or pointed it at him. She fired the weapon from her waist or hip three times. He was at that time trying to take the rifle away from her; it was in his control when the third shot was fired. The first shot struck him in the abdomen, the second in the arm, at about the elbow, and the third struck him in the leg. Thereupon, both husband and wife were taken in a car belonging to a neighbor by the name of Davidson to the Thermopolis, Wyoming hospital. Shortly after that she was taken into custody of the sheriff of Hot Springs County and brought to the Hot Springs County jail.

Dr. Vicklund, a witness for the State, on cross-examination stated without objection that he, Vicklund, heard Jones say, in response to a question as to what happened, that the shooting was an accident; that Jones was conscious when he said that. Jones was also conscious when he again, a short time afterwards, said the same thing, viz., that the shooting was an accident. This last statement was made without prompting and not in reply to any question. Jones died while under anesthetic administered before the operation advised by Drs. Vicklund and Morris. This operation was performed in an effort to ascertain if the stomach or in-

testines were perforated; they were found to be intact. The bullet which had passed into the body of the man had fractured the lower end of the breastbone, had gone across the diaphram, and nicked the top of the liver. At the autopsy, subsequent to the man's death, it was learned that one lung had been caused to collapse. The course of the bullet angled a bit upward, as Dr. Vicklund testified.

Dr. Morris, also a State's witness, (the one who assisted Dr. Vicklund in performing the operation on Jones) said he saw the defendant at the county jail on the morning of March 30, 1953. The sheriff of Hot Springs County called him; Mrs. Jones did not. The sheriff, who had called Dr. Morris, requested the doctor to administer some drug to quiet her as she was then quite hysterical and nervous. At the sheriff's direction, the doctor administered a hundred milligrams of Demerol to Mrs. Jones. This drug, the doctor said, was a narcotic. She at the time resisted the administration of the drug and it was necessary for someone to hold her so that Dr. Morris could inject the drug into her body. She was then, the record shows, in the custody of the sheriff of Hot Springs County. None of Mrs. Jones' family or friends were present. Dr. Morris again saw Mrs. Jones that evening while she was still in the county jail. This was about 5:30 or 5:45 P.M. He again gave her an injection of Demerol, seventy-five milligrams. The second time this was done she also protested against the administration of the narcotic and also again resisted it being injected. It is undisputed that no member of her family was present when either injection of the narcotic was given. At that time, she did not have the assistance of counsel. No one was present except the doctor, the county attorney, the sheriff, and the deputy sheriff. They undertook to ask her questions about the shoot-

ing. In the morning she had said the shooting was an accident; in the afternoon pursuant to being told by the county attorney that her sister and at least three other women disputed her word, the sheriff stated that she denied her story of the morning about the shooting being an accident.

In the course of Mrs. Jones' cross-examination by the county attorney of Hot Springs County, the following questions and answers appear in the record:

"1171 Q Now, you say you don't recall these conversations you had, at which the sheriff and myself were present, one conversation in the morning, around 9:30 in the morning, and the other one around 4:30; do you remember?

A I remember talking to someone, but I don't remember who it was, and I don't remember what I said.

1172 Q You don't have any idea?
A Fragments.

\*                    \*                    \*

1177 Q What part do you remember?
A I remember first you asked me what happened, and I told you that we were going to hunt prairie dogs, or something, and then I also remember telling you I slipped, but I don't remember any more than that.

1178 Q You mean an accident when you slipped?
A Yes, sir.

1179 Q You remember what conversation that was at?
A That was just shortly after I was brought to the jail, I believe.

1180 Q Do you recall the later conversation that day?
A I remember just very faintly.

1181 Q What part of it do you remember, Mrs. Mrs. Jones?

132

A   I remember you told me—you told me first of all, Andy was all right, and then I would get to go see him before very long. Then you told me my sister, and at least three other women disputed my word, said it was deliberate. Then you also said later my folks were on their way, that I didn't have to talk if I didn't want to, but you thought it would be best for me, that it would go easy on my case if I did tell the truth.

1182 Q   You remember that. You remember then whether you substantially confirmed your story of the morning?
I denied the story of the morning."

In this connection, it may be noted that these statements of Mrs. Jones were not questioned or denied by the county attorney upon examination in open court, he having never at any time taken the witness stand for that purpose; but he knew at the time of the last questioning, which occurred about 4:30 P. M., that her husband was not "all right." The record itself shows that Jones died while under the anesthetic about 3:30 P. M., March 30, 1953. It appears also that Mrs. Jones did not know that her husband was dead until the next day, the time following the arrival of her folks in Thermopolis. Mrs. Turner, a State's witness, on recall for additional cross-examination, stated:

"662 Q   You were present in the car in which Andy Jones was brought from Grass Creek to the hospital?
A   That is right.

663 Q   Did you overhear any plot between Andy and Virginia?
A   I did not.

664 Q   About any story she was to tell any one?
A   I did not.

665 Q   Were you close enough you could have heard such conversation, if there had been one?

A    I was in the front seat.

666  Q   You heard them talking?
A    Yes.

667  Q   You never heard anything like that?
A    No, sir.

### REDIRECT EXAMINATION BY MR. INGLE.

668  Q   Didn't you state on direct examination there was a conversation about it being an accident, between them?
A    All I heard was Virginia tell Andy she was sorry; it was an accident, and I asked Andy what he wanted to say about it, and he said, 'Arky, get me to the hospital—it was an accident.' That is all I heard."

Other portions of the record will be referred to as may be especially material; viz., on cross-examination of the defendant, she was asked:

"1134  Q   Now you accuse him of being brutal— never during this period have you been unfaithful to him?
A    I don't think that has anything to do with this."

That was objected to as immaterial and improper cross-examination.

The court overruled the objection, and the defendant answered:

"A    I don't believe I have been actually, never to him."

This question and answer were followed by questions on the part of the county attorney about a man by the name of "Harold"; and letters from one "Harold" to Mrs. Jones were also offered in evidence as State's Exhibits 8 and 9. These were objected to as not tending to prove or disprove any issue in the case, hearsay, immaterial, irrelevant, contents prejudice

the character of the defendant, therefore, not proper evidence in the case. The same objection was made to State's Exhibit 9. State's Exhibits 10 and 11 were also offered in evidence. Exhibit 10 was a letter by Mrs. Jones to a man in Utah to whom they owed money and wherein they promised payment to him as soon as possible. State's Exhibit No. 11 was a letter to her husband, and one from him to her—where "Harold's" name again appeared. No objection was made to Exhibit 11; and it came into evidence before the jury, as did State's Exhibits 8 and 9. It is evident these questions and their answers had no proper standing in the case. As insisted by counsel, they prove no issue involved in it. Other than Exhibit 11, the letters were two or three years old. They were insinuating attacks upon the character of the defendant. She had not made and did not make an issue of that. They had no bearing at all upon her credibility as a witness and, of course, were wholly useless as being pertinent to the actual charge that was being tried against the defendant—that charge being manslaughter.

In People v. Hetenyi, 304 N.Y. 80, 106 N.E.2d 20, 24, the court aptly said (quoting from the opinion of Cardoza, C.J., in People v. Zackowitz, 254 N.Y. 192, 197, 172 N.E. 466, 468) that:

" 'Fundamental hitherto has been the rule that character is never an issue in a criminal prosecution unless the defendant chooses to make it one. * * * In a very real sense a defendant starts his life afresh when he stands before a jury, a prisoner at the bar.' See 1 Wigmore on Evidence (3d ed), §§ 57, 192. The rule thus forcibly expressed is a rule of fundamental fairness in the protection of the individual against unjust prosecution and is inflexibly enforced in our courts. Hence, we may not overlook a breach thereof as not affecting the substantial rights of an accused within the meaning of section 542 of the Code of Criminal Procedure,

'when the purpose and effect of the breach is to create prejudice against the defendant by proof that his character is bad, even if the evidence convinces us of the defendant's guilt.' People v. Nuzzo, 294 N.Y. 227, 233, 234, 62 N.E.2d 47, 50.

"The judgment of conviction should be reversed and a new trial ordered."

In State v. Silvers, 230, Minn. 12, 40 N.W.2d 630, 631, 632, the Supreme Court of Minnesota in extremely well chosen language remarked in reversing a judgment of conviction:

"On this appeal, misconduct is charged against the prosecuting attorney for asking questions which were calculated to give an impression to the jury that defendant was a wife beater as well as guilty of assault on the complaining witness.

"On the question presented, we should bear in mind that it is the duty of the prosecuting attorney as well as the court to see that the accused has a fair trial. State v. Stockton, 181 Minn. 566, 233 N. W. 307. The words of Mr. Justice Sutherland, speaking for the Supreme Court of the United States in Berger v. United States, 295 U. S. 78, 88, 55 S. Ct. 629, 633, 79 L.Ed. 1314, 1321, are apt. He declared: 'The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.'

"Minn.Const. art. 1, §§ 6 and 7, guarantee a speedy and public trial by an impartial jury and due process

in all criminal cases. State v. Shetsky, 229 Minn. 566, 40 N.W. 2d 337. The fact that the accused takes the stand to testify does not put in issue his general character or his propensities. It opens up only the issue of credibility. State v. Nelson, 148, Minn. 285, 181 N.W. 850. As to that, prior convictions under state or federal law are admissible; but, unless the accused offers evidence of good character, the state may not attack his character in respect to the trait involved in the crime alleged at bar. State v. Nelson, supra; see 1 Wigmore, Evidence, 3d Ed., § 57, p. 455. Also, the rule is well established that the cross-examiner who inquires into collateral matters to affect the witness' credibility is bound by the answers he gets. Murphy v. Backer, 67 Minn. 510, 70 N.W. 799; State v. Nelson, supra; Johnson v. United States, 7 Cir., 215 F. 679, L.R.A.1915A, 862; 6 Dunnell, Dig & Supp. § 10348d. The state may not, in such a case, prove facts contradicting the answers. State v. Staley, 14 Minn. 104, Gil. 75; Campbell v. Aarstad, 124 Minn. 284, 199 N.W. 956; People v. Malkin, 250 N.Y. 185, 193, 164 N.E. 900, 903. With these principles in mind, we examine the record."

So the Supreme Court of Georgia in Bacon v. State, 209 Ga. 261, 71 S.E.2d 615, 616, 617, very well said:

"It is a fundamental principle in our system of jurisprudence, intended to protect the individual who is charged with crime, and to insure him of a fair and impartial trial before an unbiased jury, that the general character of the defendant and his conduct in other transactions is irrelevant unless the defendant chooses to put his character in issue. Code, §§ 38-201, 38-202; Green v. State, 172 Ga. 635, 158 S.E. 285; Hunter v. State, 188 Ga. 215, 3 S.E. 2d 729. It is universally recognized—and by the Court of Appeals in this case —that 'The general rule is that, on a prosecution for a particular crime, evidence which in any manner shows, or tends to show, that the accused has committed another crime wholly independent from that for which he is on trial, *even though it be a crime of the same sort, is irrelevant and inadmissible*'. (Italics ours.)"

The Supreme Court of Appeals of Virginia in Dean v. Commonwealth, 189 Va. 426, 53 S.E. 2d 141, 145, de-

clared:" 'No rule is better settled in Virginia than the rule that evidence of bad general reputation cannot, in the absence of statute, be offered by the Commonwealth, unless the accused has put such character in issue by first offering evidence of his good general reputation.' " (Citing many cases.)

In Harris v. State, 88 Okla.Crim. 422, 204 P.2d 305, 307, the court pointed out that:

"In the case of Pressley et al. v. State, 71 Okl.Cr. 436, 112 P.2d 809, 810, this Court held:

" 'The character of the defendant cannot be impeached or attacked by the state unless he puts his character in issue by introducing evidence of good character.

" 'Evidence of offenses other than the one charged is admissible only when it tends to prove the offense charged. To be competent, it must have some logical connection with the offense charged.

" 'Conduct of prosecuting attorney, in persisting in cross-examining the accused and witnesses for the accused by assumptions and insinuations as to previous unlawful acts and transactions, in spite of rulings against him, held improper and prejudicial. * * *

" 'Where the defendants are cross-examined as to other crimes alleged to have been committed by them, which have no connection with the offense charged, upon which alleged offenses convictions have not been obtained, and the defendants deny the commission of the alleged offenses, it is error to permit the state to introduce witnesses in rebuttal with the view of impeaching the testimony of the defendants by showing the commission of the alleged crimes, as a witness cannot be impeached upon collateral matters.' "

To the same effect is the case of Doser v. State, 88 Okla.Crim. 299, 203 P.2d 451, 467.

Similarly the Supreme Court of Ohio in State v. Cochrane, 151 Ohio St. 128, 133, 134, 84 N.E.2d 742. has ruled:

"In the opinionof the court, this type of cross-examination on immaterial and collateral matters was improper and wholly unjustified, erroneous and prejudicial to the defendant. The law on this subject is stated in 12 Ohio Jurisprudence, 325, Section 316, as follows:

" 'The presumption is in favor of the good character and the good reputation of the accused. And until the defendant offers evidence of his general good character or reputation, the prosecution cannot offer testimony of his bad character or bad reputation. In other words, the prosecution cannot prove the general bad character of the defendant, when he offers no evidence of character, nor can particular facts be shown for the purpose of affecting character, or particular acts proven of which the record gives him no notice, and which he, therefore, cannot be expected to meet.' "

See also State v. Markowitz, 138 Ohio St. 106, 33 N.E. 2d 1.

The Supreme Court of Appeals of West Virginia also in State v. Seckman, 124 W. Va. 740, 22 S.E.2d, 374, 375, has frowned upon questions of the sort here involved in this wise.

"The State can not introduce evidence 'not connected with the crime for which the accused is being tried, for the purpose of showing his bad character, until the accused has first put his own character in issue by attempting to prove a previous good character.' State v. Graham, 119 W.Va. 85, Pt. 1, Syl., 191 S.E. 8 84,State v. Burnette, 118 W. Va. 501, 190 S.E. 905; State v. Miller, 75 W. Va. 591, 84 S.E. 383, 384. In the Burnette case, this Court addressed itself to the propriety of the prosecuting attorney, on cross-examination, propounding to the accused a question strikingly similar to the one addressed to Mrs. Nutter. There, after the question was asked, the same procedure was followed as in the instant case. The Court speaking through Judge Maxwell, said (118 W.Va. 501, 190 S.E. 908) ; 'The defendant urges that the mere asking of the question involved prejudice to him. Such a question should not be asked. There is no possible justification for it. It is flagrantly violative of fundamental prin-

ciples which are so familiar to all lawyers and judges that further discussion is unnecessary.' "

In State v. Hedding, 114 Vt. 212, 42 A.2d 438, 440 (decided by the Supreme Court of Vermont), we find this was said:

"In the Daley case, 53 Vt. at page 446, 38 Am. Rep. 694, this Court stated: 'A respondent in all criminal cases is entitled to the privilege of putting his character in issue. If he offers evidence of his good character the prosecution can rebut it; and the jury have the right to give it such weight as they think it is entitled to.' It must be understood that in stating the rule in the Daley case the Court was speaking of character involving the specific trait related to the act charged, otherwise it would not be relevant and therefore not admissible. Wigmore on Evidence, Vol. 1, p. 128, sec. 59; State v. Emery, 59 Vt. 84, 89, 90, 7 A 129. We use the word character herein in such restricted sense. At the outset the respondent's character is not an issue in a criminal case. 20 Am. Jur., p 304, § 325. Therefore the State can not introduce evidence as to the bad character of the respondent unless the respondent first puts it in issue."

In State v. Sheets, 229 S.W.2d (Mo. App.) 703, 705, the Missouri Court of Appeals said:

"We, therefore, hold that the trial court committed reversible error in permitting the State to offer rebuttal testimony of the general reputation of the defendent as to morality when the defendant had not put his reputation in issue and we further hold that, because the defendant cross-examined these witnesses, he did not waive his right to complain of such error in this appeal.

"Judgment reversed and remanded."

Finally on this point, this Court itself in State v. Velsir, 61 Wyo. 476, 488, 159 P2d 371, stated the rule thus:

"The defendant electing to testify in his own behalf occupies a double position. As a defendant, his charac-

ter cannot be attacked by the State; as a witness he puts credibility at issue like any other witness."

Again, on cross-examination, we have seen that the prosecuting officer, the county attorney—after a narcotic drug, Demerol, had been injected into her body over her protest and against her physical resistance—subjected her to questioning. At that time, she had no counsel to aid her, no member of her family was even present, nor were there friends of the family present at the time. Mr. Luck, a friend of the Jonses sought to see Mrs. Jones about noon of that day, but was refused the privilege by the deputy sheriff. (This occurred about 11:30 A. M., March 30, 1953.) Subsequently, Luck talked to the county attorney and then about 1:30 P.M. went to the jail and was permitted to see the woman. He testified at the trial that "she was in no condition to talk to anyone." Luck only stayed about five minutes. The sheriff of Hot Springs County on cross-examination stated that he called Dr. Morris and asked him to give her a sedative, hypodermic injection. These questions and answers appear in the record of the sheriff's cross-examination:

"555   Q   She was very nervous?
       A   Yes.

556    Q   Did you call Dr. Morris, and ask him to give her a hypodermic injection?
       A   I did.

557    Q   Did she calm down after that?
       A   No; not too good.

558    Q   Did you know at the time what the injection was?
       A   I did not."

We find that the judgment of conviction in State v. Dena et al, 28 N.M. 479, 481, 482, 214 P. 583, was reversed; and Judge Bratton of that Court employed the following language:

"It is affirmatively shown by the state's evidence, however, that prior to making their confessions to the deputy sheriff Bob Roberts, who then had them in his custody upon his charge, the appellants asked him if they would be hurt if they confessed; that in response to such inquiry he told them that they would not be hurt, and that it would be better for them to tell the truth. Whether or not such promises so made or inducements so held out by the officer having the accused in his possession and which may tend to establish hope in the mind of the accused are such as to render confessions made under such circumstances inadmissible is a question which has frequently been considered by the courts of other states. The authorities are divided with reference to whether the mere advice on the part of such officer to tell the truth—that it will be better to tell the truth—is sufficient to show improper influence in inducing the confession. We are not required, however, to determine whether the mere adjuration to tell the truth is sufficient to exclude the evidence of such confessions. In this case we have this advice on the part of such officer, coupled with the further fact that he told and assured these appellants, who are shown to be Indians, unable to speak the English language, and who doubtless in this helpless condition relied largely upon such officer and his advice and assurance, that they would not be hurt. These two things together, we think, are sufficient to render the confession made immediately thereafter involuntary. The underlying reasons for this conclusion are that confessions must not be received in evidence when influenced, however slight, by direct or implied promises made by any person in authority. When such promises are shown, the law cannot measure the force of the influence thereby produced; neither can the courts determine in what degree they affected the mind of the accused and to what extent they entered into his decision to confess. Hence the rule is established that, when it is shown such promises, either express or implied are so made by person in authority, confessions which are made pursuant thereto must be excluded."

Similary, the Supreme Court of Georgia in Turner v. State, 203 Ga. 770, 48 S.E.2d 522, 523, also reversed a conviction, saying:

". . . as was said in King v. State, supra, the provisions of § 38-411,, require the exclusion from evidence of any confession that is induced by another by the slightest hope that the confession would make his punishment lighter. Accordingly, the confession or incriminatory statement in the present case, in which the accused was convicted of murder with a recommendation of mercy, was inadmissible, inasmuch as it is shown by the record that the sheriff to whom it was made and who had arrested the accused, testified that 'All I told him was if he would tell the truth it would be lighter on him,' and the confession or incriminatory statement followed that statement of the sheriff. Such a statement by the arresting officer was improper and no doubt gave the accused, not merely the 'slightest hope.' but a real hope for lighter punishment. The court erred in admitting the alleged confession or incriminatory statement of the accused over objection.

"3. While we have ruled on the admissibility of the statement of the accused according to the law applicable to confessions, though it may amount to no more than an incriminatory statement, the rule as to its admissibility is the same as that applied to a confession. See Fuller v. State, 109 Ga. 809, 35 S.E. 298; Mill v. State, 3 Ga. App. 414, 60 S.E. 4."

In the Crown case reserved of Reg. v. Fennel, L.R. 7 Q.B. 147, 148, before the Judges of the High Court of Justice, Queen's Bench Division, composed of Lord Coleridge, Lord Chief Justice of England, President, Sir William R. Grove, Sir Henry Hawkins, Sir Henry Charles Lopes, and Sir James Fitzjames Stephen, it appeared that:

"The question upon which the Court are asked to give their opinion is:—Whether the admissions made by the prisoner Fennell were properly received in evidence as against him.

"The following are the circumstances under which the admissions were made:—Previously to be charged, Fennell was taken into a room with the prosecutor and Inspector Chamberlain. The prosecutor then said to Fennell, 'he (meaning Chamberlain) tells me you are

making house-breaking implements; if that is so, you had better tell the truth, it may be better for you.'

"The point was then raised by Fennell's counsel as to whether these admissions of Fennell could, after what the prosecutor had said to him, be received in evidence."

Fennell was convicted mainly upon admissions made by him in the presence of the prosecutor and the police inspector, Chamberlain, before he was charged with the crime of larceny. Lord Coleridge, Chief Justice, declared:

"The rule laid down in Russell on Crimes 5th ed. vol. iii, pp 441, 442, is, that a confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. It is well known that the chapter of Russell on Crimes containing that passage was written by Sir E. V. Williams, a great authority upon these matters.

"It is found in effect by the presiding judge in the present case that the words did not operate as a threat of evil or promise of good upon the accused."
The Chief Justice then announced for the Court that:

"We are all of opinion that this conviction cannot stand. Upon well decided cases we are of opinion that this statement is inadmissible."

On cross-examination of Mrs. Jones, as we have indicated above, it appears she told the county attorney that the latter assured her her husband was "all right" and that she "would get to go see him before very long;" that she didn't have to talk if she didn't want to but, said the prosecuting officer to her, he "thought it would be best for" her "that it would go easy" on her case if she "did tell the truth." These statements were not denied by the county attorney. It would seem that the first statement of that officer was untrue and constituted an assurance on his part that she would not

be prosecuted for homicide. The statement of the county attorney that it would be best for her to talk, that if she did "it would go easy" on her case if she would tell the truth, was, it would appear an inducement to do just that. (See the Crown case reserved of Reg. v. Fennell, supra.)

In Mortimore v. State, 24 Wyo. 452, 464, 161 P. 766, Mr. Chief Justice Potter stated the rule as to the admission of confessions by quoting from Wharton's Criminal Evidence, Section 649, as follows:

" ' . . . But the rule is equally well settled that even a slight inducement held out by such a person renders the confession involuntary, because the accused would have reason to believe that such person is not only credible, but is in a position to carry the inducement into effect.' "

The same statement appears in Volume 2, Section 636, of the 11th Edition of that work and numerous authorities are cited in support thereof.

In Maki v. State, 18 Wyo. 481, 486, 112 P. 334, (an opinion written by Mr. Justice Scott, in which Mr. Chief Justice Beard and Mr. Justice Potter concurred) this Court also has said:

"The word voluntary as applied to evidence given by one at a coroner's inquest who is not under arrest but who knew he was under suspicion of having perpetrated the homicide under investigation, and who was subpoenaed as a witness and afterward charged and tried for such homicide is learnedly discussed in Tuttle v. People, 33 Colo. 243, 70 L. R. A. 33. In that case the court adopts the definition of what constitutes a voluntary statement used in this sense as given in State v. Clifford, 86 Iowa 850, 41 Am. St. Rep. 518, 53 N. W. 299, as follows: 'A statement, to have been voluntarily made must proceed from the spontaneous suggestion of the party's own mind, free from the influence of any extraneous disturbing cause.' " (Italics supplied.)

Whether the statements of the defendant — made under questioning on the part of the law officers of the county—were admissible as confessions or admissions voluntarily made is hardly in accord with the rule adopted by this Court in Maki v. State, supra. We certainly do not approve of the treatment the defendant received at the hands of the sheriff and county attorney at the Hot Springs jail on March 30, 1953.

Bear in mind that at that time Mrs. Jones was not charged with any crime at all and, under the circumstances, did not nor could not know, in view of the failure of the officer to advise her that her husband had died, whether she would be. The county attorney had stated to her (before she told the law officers of Hot Springs County that her statement that the shooting was an accident was untrue) that her sister and three other women disputed her word, although this statement was likewise untrue; and, further, as set out above, a narcotic drug had been forcibly injected into her body at the direction of the sheriff, against her protest, and over her forcible resistance.

It may not be amiss to mention here, also, that the State's witness, Wonetta A. Turner, on recall for cross-examination and redirect by the county attorney, himself, stated that although she sat in the front seat of the car which brought Mr. and Mrs. Jones to the Thermopolis hospital and heard them talking, nevertheless, she did not hear "any plotting" between them about any story Mrs. Jones was to tell. (See the verbatim record of Mrs. Turner's testimony on the point as recited above.) Although her sister's name was endorsed on the information, she was never called as a witness; and the other women who were called said nothing about the shooting being claimed untruthfully by the Joneses to be an accident. Jones himself repeatedly told the doctors it was an accident. There

were no instructions given the jury on that particular point.

Whether Mrs. Jones was misled by the statements of the county attorney is far from clear, and this matter should be perfectly clear before a jury should be permitted to deliberate upon what she said at that time.

As we find the record before us, we have little hesitation in reaching the conclusion that the judgment below should be reversed and a new trial granted and such an order should be made.

Reversed and new trial ordered.

BLUME, C. J., AND HARNSBERGER, J., concur.