THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* MAURICE MALKIN, LEO FRANKLIN, SAMUEL MENCHER, JACK SCHNEIDER, PHILIP LENHART, MARTIN ROSENBERG, OSCAR MILEAF, JOE KATZ and GEORGE WEISS, Appellants.

(Argued November 26, 1928; decided December 31, 1928.)

*George Z. Medalie, George Sylvester* and *Jacob J. Rosenblum* for appellants. The court erred in permitting prejudicial cross-examination of defendants. (*People v. Davey,* 179 N. Y. 345; *People v. Sobieskoda,* 235 N. Y. 411; *People v. De Garmo,* 179 N. Y. 130; *People v. Follette,* 164 App. Div. 272; *People v. Nelson,* 145 App. Div. 680; *People v. Slover,* 232 N. Y. 264.) The conduct of the prosecutor was prejudicial to defendants. (*People v. Fielding,* 158 N. Y. 542; *People v. Esposito,* 224 N. Y. 370; *People v. Wolf,* 183 N. Y. 464; *People v. Buzzi,* 238 N. Y. 390; *People v. Davey,* 179 N. Y. 345; *People v. Becker,* 210 N. Y. 274; *People v. Moran,* 246 N. Y. 100.)

*Elvin N. Edwards, District Attorney (Charles I. Wood* of counsel), for respondent. No error prejudicial to the defendants requiring reversal arose from the cross-examination of the defendants as to other crimes and assaults. (*People v. Molineux,* 168 N. Y. 264; *People v. Zucker,* 20 App. Div. 363; 154 N. Y. 770; *People v. Dolan,* 186 N. Y. 4; *People v. Marrin,* 205 N. Y. 283; *People v. Katz,* 209 N. Y. 311; *People v. Grutz,* 212 N. Y. 72; *People v. Duffy,* 212 N. Y. 57; *People v. Thau,* 219 N. Y. 39; *People v. Ryan,* 232 N. Y. 234; *Altman v. Ozdoba,* 237 N. Y. 218.)

LEHMAN, J. In April, 1926, at a time when the " Joint Board Furriers' Union " was conducting a strike

in the fur industry of New York city, a band of ten or twelve men raided a fur shop belonging to two brothers named Barnett in the village of Rockville Centre, assaulted the proprietors and destroyed property. Until that time, the fur shop had not been involved in the strike in any way. No pickets had visited, or paraded in front of the shop. The only employees of the Barnetts were two girls. One escaped from the shop and called for the police. The raiders ran off. The Barnetts and their employees had recognized one of them, Barnet Basoff. He was an intimate friend of one of the proprietors. They had been schoolmates in England. Their friendship had been renewed here. They had dined together in amity the day before the raid.

Within a few minutes of the raid the police arrested two of the defendants, Malkin and Franklin. The Barnett brothers and their two employees positively and immediately identified them as part of the raiding party. Both admitted that they were members of the strikers' union. They said that they had been picketing on the street in front of the Barnett shop. They had seen the raiding party enter the shop, but had taken no part in the raid. Indeed — so they said — they did not know many of the raiders and had joined in the calls for the police. At the time of their arrest, they claimed that they were looking for the railroad station, to return to New York.

Basoff, Malkin and Franklin were jointly indicted. The Barnetts and their employees did not know the others who were in the raiding party — though one of the girls testified that she had previously seen some of them in the fur " market " or district of New York city. Basoff confessed to the police that he had taken part in the raid. He implicated Malkin and Franklin. They were tried together. At the trial Basoff recanted his confession and claimed that it was extorted by the police by threats and violence.

The striking union gave bail for the three accused, furnished a lawyer for the trial, and paid the expenses of an appeal from their conviction. The Appellate Division gave judgment reversing the conviction of Franklin and Malkin. The conviction of Basoff was affirmed.

After his conviction and while the appeal was pending, Basoff visited the District Attorney, and again confessed his guilt. Then for the first time he stated that Benjamin Gold, the head of the Joint Board of the International Fur Workers' Union, ordered the raid upon the little fur shop and arranged the details though he took no active part in it. This time he named as active participants in the raid not only Franklin and Malkin but also Isidore Shapiro, a member of the strike committee assigned to duty as chairman of the law committee of the union, Samuel Mencher, the chairman of the picket committee of the union, and the other defendants who were subsequently jointly indicted for assault. Wisenbloom, a former employee of the Barnett brothers, who like Basoff had been friendly with them as a school boy in England, was also named by Basoff as a party to the raid, though it is said that he remained downstairs and did not enter the fur shop. He was at some time indicted and pleaded guilty to the charge of assault. At the time of the trial he was awaiting sentence.

At the trial Basoff, the intimate friend of the Barnett brothers, and Wisenbloom, their former friend and employee, testified against the accused. They are confessed participants in the crime. Their testimony is not free from reasonable grounds of suspicion. All the accused except Gold were identified by Mary Farkas, one of the girls employed by the Barnett brothers; but her identification, made many months after the event, of men whom she had previously not known or at most had known only by sight, is not entirely convincing. Finally, detectives testified that all the defendants when arrested individually and voluntarily made admissions

to them which undoubtedly tend, if true, to connect them with the crime, but no signed admissions were obtained from any, and the captain of police who was present when some of the admissions were said to have been made did not hear them.

The accused all denied guilt and denied making any admissions. With the exception of Franklin and Malkin, who undoubtedly were in Rockville Centre at the time of the raid, all claimed that on the afternoon of April 19th, 1926, when the crime was committed, they were in New York city, and produced witnesses who supported their testimony. Undoubtedly at that time an important meeting of the " shop chairmen " of the union was being conducted, and Mencher and three others produced evidence to show that they were present at that meeting. Testimony was also produced which, if true, would tend to show that the raid was arranged by Basoff and Wisenbloom to satisfy a private grudge, and that Basoff's story to the District Attorney implicating the union leaders was concocted by him in a spirit of revenge because these leaders refused to submit to blackmail.

The jury acquitted Gold, in spite of the testimony against him given by Basoff and Wisenbloom, and in spite of the evidence that he had made damaging admissions to the police, or that, indeed, he had avowed, and attempted to justify, participation in the crime charged. The jury acquitted Shapiro, in spite of the fact that the testimony of Basoff and Wisenbloom against him, the identification by Mary Farkas, and the proof of alleged admissions made to the police were just as positive and in every way as strong as the testimony and proof against any of the other defendants except Malkin and Franklin, and the same witnesses testified against all. In his case the jury rejected all that testimony. They could not reasonably do otherwise, for he was able to produce as a witness a general in the National Guard who testified that twice on the afternoon of the raid, when, according

to the claim of the People, Shapiro was assaulting the complaining witness in Rockville Centre, Shapiro had visited him for the purpose of hiring an armory in which to hold a great meeting of the members of the striking union. Certainly no friendship or bias could have colored the testimony of that witness and he gave details which almost completely exclude possibility of mistake. The other defendants who could not produce in their behalf witnesses of the same evident credibility were all convicted, though the testimony against most of them was no stronger.

It is unnecessary to analyse the testimony further at this point. We may not consider the weight of evidence, and there can be no doubt that there is evidence which in law is sufficient to sustain a finding of guilt against all the defendants, even though it might not be difficult to point out reasons for distrusting much of that evidence. Against Malkin and Franklin, who admit being near the place of the assault and who were identified the same afternoon as participants in it, the evidence is, indeed, convincing. The issue of the guilt of the other defendants depends on sharply disputed questions of fact, and we must examine the rulings of the trial judge to determine whether the defendants have been deprived by such rulings of the opportunity to present their case fairly for the impartial consideration of the jury.

It is urged that the court erred in excluding a writing signed by officers of the American Federation of Labor and embodying terms of an agreement intended to settle differences which had arisen between the American Federation of Labor and its subsidiary union, the " Joint Board." Undoubtedly such an agreement had been tentatively arranged between the leaders of the Joint Board of the local unions conducting the strike and the leaders of the parent body. Undoubtedly a meeting of the " shop chairmen " of the Joint Board was held on April 19th to consider the tentative agreement. The

writing, embodying the written agreement, was excluded, not because such evidence was incompetent but because those facts upon which the writing might have probative value had already been abundantly proven. The proffered evidence, even if competent, was merely cumulative. The jury already knew, in a general way, the contents of the writing. The trial judge, we think, made sufficiently plain to the jury that there could not be any substantial controversy in regard to the fact that a meeting was held and the purpose of the meeting. The defendants would not have obtained any substantial advantage by admission of the writing and its exclusion did not constitute reversible error.

More serious is the claim that erroneous rulings of the trial judge gave license to the District Attorney to influence the jury in its consideration of the guilt of the accused by introducing into the record at least suggestions of matters which were irrelevant and unproven, and which were calculated to prejudice the jury. The trial judge stated, in effect, while the People's case was being presented, that the People might not affirmatively prove that the defendants or some of them had on other occasions been guilty of violence. No exception was taken to this statement and the question is not before us whether the People might otherwise have offered evidence of assaults committed on other occasions which would have been competent under the rule formulated in *People* v. *Molineux* (168 N. Y. 264). Then the defendants would have had the right to controvert such evidence. Here no such evidence was received, yet, it is urged, the District Attorney was permitted to cross-examine the defendants in a manner intended to suggest to the jury that the defendants, in spite of denial, were, in fact, guilty of habitual acts of violence and should be convicted and punished for the protection of society.

All the defendants testified in denial of the charges against them. They were, of course, like other witnesses,

subject to cross-examination. They might be questioned as to their participation in acts of violence on other occasions. Admission of guilt of crimes, other than that charged in the indictment, might affect their credibility. Denial of guilt was conclusive upon the People. The People might neither suggest nor prove facts contradicting the denial. The defendants had no opportunity to controvert what the People might not prove. Samuel Mencher, chairman of the picketing committee, was the first defendant to take the witness stand. He claimed that on the afternoon of the assault he was present at the meeting held to enable the " shop chairmen " of the striking union to ratify the tentative agreement intended to settle the disputes and differences which had arisen between the striking local unions, its parent body, the International Fur Workers' Union, and the American Federation of Labor. Other witnesses, including reporters of three news journals, corroborated his testimony. That differences existed between the local unions, of which Mencher was one of the leaders, and the American Federation of Labor, was brought to the attention of the jury. It may be that the American Federation of Labor has earned such an enviable reputation for honesty of purpose and act that the general public assumes, even without evidence, that any dispute which the Federation may have with another labor organization must be due to some unworthy conduct on the part of its adversary. Perhaps some prejudice against the defendants was created by the evidence, properly admitted, of the existence of a dispute between their union and the American Federation. Of such prejudice the defendants may not complain in this court. It has not been caused by any erroneous ruling of the trial judge. The People might not, however, create or intensify such prejudice, if it existed, by suggestion to the jury that the American Federation of Labor had already adjudged the defendants

guilty of a concerted plan to enforce economic demands by force and violence or to subvert our government. The People might not suggest to the jury, in spite of denials by the defendants in the course of their cross-examination, that they had participated in other acts of violence. The People might certainly not ask the jury to base a finding of guilt upon circumstances not relevant to the issues, which were not proven by competent evidence and which the defendants had no opportunity to controvert.

Nevertheless the District Attorney was permitted to cross-examine Mencher in a manner which violated all these rules. Mencher denied that he had ever been in any raid with any of his men prior to April 19th. Then, over objection and exception, the District Attorney was permitted to call upon seven persons in succession to stand up and confront the defendant Mencher, while questions were put to him as to his alleged participation in assaults upon these persons and while he denied such participation. Many of these questions were phrased in such manner as to suggest that a denial would be false. The limits which must be placed upon the length of a judicial opinion prevent the inclusion, verbatim, of the parts of Mencher's examination which are open to such criticism. They cover many pages of the printed record. They must have been intended to bring home to the jury the impression that the persons confronting the defendant on the stand were silently accusing him and that his denials were false and perjured.

The District Attorney was not satisfied merely with the silent accusation of the persons produced to confront Mencher. He was permitted to ask questions intended to show that the American Federation of Labor had already decided that Mencher and his associates in the striking union were guilty of other acts like those with which the defendants were charged. Over objection and exception Mencher was asked: " Is it not a fact that the

Joint Board Furriers' Union had been suspended or expelled from the American Federation of Labor? " To this question the defendant answered, " Yes."

There can be no doubt that the admission of that question constituted legal error. However excellent the reputation of a private association of citizens may be, the law does not give to its accusation or fiat of punishment the conclusive quality of a conviction by a court of justice. Actual guilt of charges preferred against a member may at times be relevant. If so, that guilt must be shown by competent evidence and not by a finding of an extra-judicial tribunal. Nevertheless the District Attorney was permitted to follow up this question by another: " Is it not a fact that the American Federation of Labor expelled the Joint Board, headed by Ben Gold, and you and associates, because of these people cutting up people and methods of breaking up of machinery? " The answer, " It is not true," was followed by a number of other questions of similar nature, all intended to suggest that the denial was false.

The impression that the answers were false must have been heightened by questions as to articles in the New York *Times* and other papers, the contents of which, of course, could not be admitted in evidence. We shall refer only cursorily to other rulings of the trial judge which are challenged and which may have influenced the jury in its consideration of the case. Some of the defendants had been convicted of disorderly conduct. The District Attorney was permitted to show, in addition, that the charges against them had originally included more serious offenses. He even argued to the jury that they might infer that in the " little police courts " of New York city the defendants by the use of political influence had been able to have the charges reduced. . Mencher was asked whether he was convicted of felonious assault. He answered that he had received a sentence of sixty days but his conviction was reversed. It is not disputed that his con-

viction was reversed, yet the court over objection insisted that he must nevertheless answer directly the question, "Were you convicted?" thus suggesting that even a conviction which has been reversed by a higher court affects the credibility of the witness. Finally, the defendants were cross-examined as to whether they were communists; whether their union was not a "left wing" organization, and even whether they read newspapers which are said to have communist leanings. Some of the defendants denied that they held views in favor of communism; others frankly avowed them. We do not stress any single error which may lie in these rulings. The trial judge in his charge removed so far as he could the prejudice which might arise from the suggestion that any of the defendants were communists. Other errors are perhaps not serious, when considered separately, and some of these rulings may involve only the exercise of discretion; yet cumulatively the effect of the questions, which were permitted, tended to intensify, at least to some degree, the impression, which the District Attorney was endeavoring to create, that these defendants were undesirable citizens.

We review in the calm atmosphere of an appellate court the rulings made by another judge in the tense atmosphere of a criminal trial. No impossible standards of perfection may be applied. We recognize that, however great the learning of the trial judge may be, and however calm and judicial his temperament, it is impossible for him to rule on all questions in the excitement and speed of a criminal trial as he himself would rule after opportunity for careful consideration. His function is to guide the trial in such manner that the jury may pass fairly and intelligently upon the guilt of the accused and base its determination upon all the competent evidence offered by both sides, and upon nothing else. In the conduct of the trial there is a large field for the exercise of judicial discretion. Upon rulings which come

within the limits of the field of discretion we do not pass. Even though the judge be learned and fair — and in this case counsel for the defendants expressly disavowed criticism of the trial judge — he may yet make erroneous rulings on questions of law which may affect substantially the fairness of the trial.

The manner and extent of the cross-examination lies largely within the discretion of the trial judge. The law, however, does impose some limits, and rulings which permit the prosecuting attorney to put questions on cross-examination which lie outside such limits constitute errors of law. A witness may be cross-examined as to matters which tend to discredit him. Prior conviction of crime is undoubtedly a proper subject of cross-examination. A mere charge, though embodied in an indictment, does not itself show guilt, and a ruling which overrules an objection to such a question constitutes an error of law. (*People* v. *Irving*, 95 N. Y. 541; *People* v. *Crapo*, 76 N. Y. 288.) So, too, it is error of law to admit questions as to whether a witness has been expelled from a private or semi-public organization. (*Nolan* v. *Brooklyn City & Newtown R. R. Co.*, 87 N. Y. 63, 68.) True, it has been held in many cases that the error may be rendered immaterial by the nature of the answer. A denial interposed to such question may be, as matter of law, conclusive. Where, however, by innuendo or suggestion, attempt is made to lead the jury to believe that the denial is not conclusive; where questions are permitted which are calculated by suggestion of misconduct to prejudice the jury regardless of the answer given, then it may hardly be said that the error in permitting the questions is harmless. The rule that an answer elicited on cross-examination is conclusive affords little protection to an accused if the jury is induced to believe that it should act upon the assumption that the answer is untrue. The court may not close its eyes to results which are intended to flow and do flow from the question itself.

We will not say that denial, made by a defendant on cross-examination, of misconduct in a collateral matter renders harmless a question which is "asked for the improper purpose of planting in the minds of the jury suspicion and distruct by insinuations that the defendant has falsely denied his guilt as to collateral matters." (*People* v. *Slover*, 232 N. Y. 264.) The error in this case in permitting the District Attorney to question Mencher about the suspension or expulsion of the local union, in which the defendants were associated, from the American Federation of Labor was intensified by the admission of subsequent questions phrased in manner to suggest, in spite of denial, that disciplinary action was taken because of habitual use of violence.

It is not easy to define the limits of the field of judicial discretion in cross-examination. "One of these limits should be that a district attorney shall not deliberately, by questions really containing no element of misconduct and by parading witnesses as a challenge to the defendant, create false impressions that he has been guilty of misdeeds when the evidence does not sustain any such conclusion." (*People* v. *Freeman*, 203 N. Y. 267.)

Here it may well be that the District Attorney did not "deliberately" attempt to create prejudice against the defendants in the mind of the jury. They were charged with a serious offense, and if guilty, they should not go unpunished. They were defended by practiced lawyers, alert to seize any legitimate advantage for the defendants. Zeal in the public interest, which the District Attorney was under duty to protect, may well have led him to errors which he would not have made if there had been opportunity for deliberation. Nevertheless the District Attorney did, in the heat of the trial, ask questions which were calculated to prejudice the jury. By repeated questions put over proper objection and exception, he brought to the jury the suggestion that some or all of them habitually used, or sanctioned the

use of, violence in a labor dispute. He confronted Mencher with seven persons in manner evidently intended to lead the jury to regard them as silent witnesses in contradiction of Mencher's denial that he had assaulted them. Certainly the form of the questions and the production of these persons must at least have tended to produce the impression that even if Mencher's denial was true, yet they had actually been assaulted by some organized strikers. There are, of course, times when it is proper to question a witness about alleged transactions with persons who are pointed out to the witness in court, instead of being merely named. Ordinarily difference in the manner in which a person referred to is identified is immaterial, indeed at times there may be legitimate purpose in bringing the person to court and there pointing him out to the witness. Then choice of manner of questioning may be well within the field of judicial discretion. Not so, when the purpose and effect of the questions and the confrontation of the witness by persons the witness is accused of wronging, is to create the impression that, in spite of denial the defendant has been guilty of misconduct in a collateral matter which the jury should take into consideration when determining his guilt. Then a ruling made over objection and exception may constitute error of law and not merely an error of judgment. (*People* v. *Freeman, supra.* See, also, *People* v. *Lewis*, 313 Ill. 312; *People* v. *Derbert*, 138 Cal. 467; *State* v. *Goodwin*, 271 Mo. 73; *State* v. *Taylor*, 144 Minn. 377; *Perkins* v. *Commonwealth*, 199 Ky. 128.)

Perhaps we cannot say with certainty that the jury was influenced in its consideration of the guilt of the defendants by any suggestion that they were guilty of other acts of violence or that the American Federation of Labor had already found them guilty and had suspended or expelled their union. Doubtless the jurors intended to judge the accused fairly, and their judgment was not

so completely blinded by any prejudice, wrongfully created, that they failed to see the force of the evidence which Gold and Shapiro produced in their own behalf. The jury acquitted them; it convicted other defendants against whom almost the same evidence was produced. The question before us is not whether the jury was induced to convict without weighing the evidence, solely because of prejudice. Seldom, if ever, do juries in this State so act. They did not do so in this case. The real question before us is whether erroneous rulings on questions of law prejudiced the right of the accused to an *impartial* consideration of the competent evidence.

The summing up of the District Attorney shows, at least, that he urged that the jurors, in their consideration of the defendants' guilt, should assume that the defendants were men who sought to overthrow our social structure; men who were guilty of other acts of violence and who were part of a group which, in the opinion of the leaders of the American Federation of Labor, conducted labor disputes in an improper manner.

In determining the effect of the rulings which made such appeals possible, we may well assume that judge, District Attorney and jury intended to act fairly towards the accused. Nevertheless the fact that the District Attorney was permitted over objection and exception to conduct the examination in a manner to suggest to the jury that the defendants habitually sanctioned or participated in violence, and the fact that the District Attorney asked the jury to give serious consideration to that suggestion in determining the guilt of the defendants, may not be disregarded as unimportant. A considerable part of the trial was devoted to the attempt to bring home to the jury the impression that these defendants were dangerous citizens and that the assault upon Barnett, with which the defendants are charged, was a part of their tactics of warfare against the peace and order of the community. We cannot say that the District Attorney failed to create the impression he intended.

The law draws a distinction between the effect which may be given to a charge of misconduct and to proof of misconduct; between the effect of admission of misconduct elicited upon the cross-examination of a defendant to impeach his credibility as a witness, and affirmative proof of misconduct on other occasions as a relevant factor in the determination of the guilt of a defendant of the crime for which he is being tried. Experience and common sense alike must lead to the conclusion that juries often disregard such distinctions. (See 2 Wigmore on Evidence, § 981.)

The record of the trial may lead to suspicion that the defendants or some of them are enemies of society as organized in this country, but that suspicion rests upon innuendo rather than upon proof. Society must protect itself against the violence of its enemies. Attack must be followed by punishment of the guilty, but punishment must be based upon determination of guilt by a jury after a fair trial. Society may be endangered as much by the violence of its friends as of its enemies, and an appeal to prejudice as a factor in determination of guilt is, in the final analysis, an appeal to violence. The majesty of the law must remain unchallenged. It is threatened by each trial where there is a justified doubt of fairness and impartiality.

Such doubt exists here as to all the defendants, except Malkin and Franklin. They were entitled to a trial in which conviction might be based solely upon competent evidence. They have been charged, without proof, with the habitual use of violence to advance the interests of their union. They have been pilloried as men who have been outlawed, because of their habitual appeal to violence, by the reputable leaders in the labor movement. May we now say that these circumstances did not affect the jury in its consideration of their guilt?

There is a sound foundation for the inference that the determination of the guilt of Malkin and Franklin rests

solely upon competent evidence. Concededly they were present in Rockville Centre and in the immediate vicinity of the assault at] the time it took place. They were promptly identified by four persons. There is small, if any, ground for belief that the identification was mistaken. Their own explanation of their presence in Rockville Centre is unconvincing. As to them the jury was called upon to decide only the narrow question: did they remain on the sidewalk picketing the fur shop when the shop was being raided by others? To the overwhelming evidence against the two defendants upon this narrow issue, the suggestion that these defendants habitually used violence would add no appreciable force. It is inconceivable that as to them the jury would consider suggestions or innuendo of violence on other occasions, when proof was almost conclusive that they were present upon the occasion when violence was actually used, as charged in the indictment. Their conviction must be affirmed.

There is no sound foundation for any inference that the determination of the guilt of the other defendants rests solely on competent evidence. We have shown that the evidence *against* these defendants is almost identical with the evidence *against* Shapiro, whom the jury acquitted. The evidence in *favor* of Shapiro was, however, entirely different. He produced as a witness in his behalf a leader of the militia, sworn to preserve the public peace; a man in no wise connected with the union, and not a personal friend of any of its members. His testimony the jury properly believed. The witnesses in favor of the other defendants were men with whom the defendants customarily associated. The jury might scrutinize their testimony carefully, because they were friendly to the defendants; though to me, personally, the evidence in favor of Mencher, at least, seems convincing. Most of them were members of the same group in the union, charged by innuendo with the habitual use of

violence and pictured as engaged in a warfare against society. The jury chose to disbelieve them. In such circumstances it may hardly be said that the erroneous rulings at the trial did not affect the jury's consideration of the competent evidence. For these reasons the judgments of conviction of the defendants Malkin and Franklin should be affirmed and the judgment of the Appellate Division and that of the County Court as to the other defendants should be reversed and a new trial ordered.

CARDOZO, Ch. J., POUND, ANDREWS and KELLOGG, JJ., concur; CRANE and O'BRIEN, JJ., vote to affirm as to all defendants.

Judgment accordingly.