THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* MICHAEL DU BYK, Appellant.

*Per Curiam.* Appellant was convicted of the crime of robbery in the first degree. On this appeal from the judgment of conviction he claims that he did not receive a fair trial because the District Attorney was permitted to question him at great length about two other crimes of a similar nature. Those crimes had taken place in the same neighborhood as the occurrence for which appellant was being tried. Although appellant denied committing them, the District Attorney attempted to impeach his credibility by further cross-examination. He has that privilege. (*People* v. *Sorge,* 301 N. Y. 198, 200.) "There can, of course, be no doubt as to the propriety of cross-examining a defendant concerning the commission of other specific criminal or immoral acts. * * * And if the questions have basis in fact and are asked by the district attorney in good faith, they are not rendered improper merely because of their number."

We do not think the good faith of the District Attorney can be seriously questioned. "'The manner and extent of the cross-examination lies largely within the discretion of the trial judge.'" (*People* v. *Sorge, supra,* pp. 201–202; *People* v. *Malkin,* 250 N. Y. 185, 197.) There was no abuse of discretion on the part of the trial judge particularly in view of the fact that no objection was taken by appellant's counsel to the continuance of the line of questioning.

It is also contended by appellant that the evidence of identification was insufficient. The only identification was by the victim himself, but it was positive and certainly sufficient to support the jury's finding. To hold that the identification made by the witness Morton is insufficient would practically be the equivalent of saying that identification by the victim of a crime must be corroborated.

It is suggested that the extended cross-examination of the appellant as to the other crimes may have, in view of their similarity, prejudiced the jury on the question of identity and bolstered what otherwise was a weak identification. In the first place as heretofore indicated, the identification was not weak, but was definite and positive. Nor can it be fairly said that the cross-examination by the District Attorney was unnecessarily overextended — certainly not to an extent where it could be considered to have influenced the jury's judgment on the question of identification.

We think the appellant received a fair trial and that the evidence sustains the jury's verdict. The judgment should be affirmed.

BOTEIN, J. (dissenting). On February 21, 1952, at about 1:45 A.M., the complainant Frank Morton parked his car alongside the entrance to a schoolyard lying between Shakespeare and Nelson Avenues in Bronx County. As he was about to step out Morton was forced back into his automobile by a man who later threatened him with a black automatic gun. After some temporizing he handed over his wallet to the robber, who then fled through the schoolyard.

Morton immediately reported the holdup to the police. He was shown photographs from time to time but could not identify any of them. Finally, eleven months later, after a rather tentative identification of defendant's photograph, he was confronted with him in a precinct station house. Upon the trial Morton

testified that he immediately recognized defendant as the man who held him up and that after hearing him speak he was positive of his identification. Defendant denied any knowledge of the crime but was taken into custody.

Upon this identification defendant was indicted, brought to trial and convicted. He appeals from the judgment of conviction of the crime of robbery in the first degree, for which he was sentenced as a second felony offender to a term of fifteen to twenty years in State prison.

On February 25, 1952, at 3:00 A.M., four days after the Morton robbery, a taxi driver named Britman was held up in the vicinity of the schoolyard under similar circumstances. The robber also pointed a black automatic and after commission of the crime also fled through the schoolyard. Shortly afterward Britman and two policemen visited defendant's apartment and the policemen searched the premises. It appears from the testimony that Britman failed to identify defendant and that the police search produced nothing incriminating.

A few days later, on March 2, 1952, at 4:30 A.M., another taxi driver named McEachin was held up at the point of a black automatic, at about the same place. Again the robber made his escape through the schoolyard. It can be inferred from the record that McEachin was confronted with defendant in a police station a long time afterwards, but was unable to identify him.

The People called as witnesses only Morton and a detective. The latter's testimony was unimportant, since defendant had steadfastly denied committing the crime. Defendant was the only witness called in his own behalf. At first blush it would seem, therefore, that the trial reduced itself to a question of veracity — as to whether, as a person, Morton was worthier of belief than defendant. But to pit defendant against Morton on such terms was to stage a one-sided contest.

Defendant was a bad lot, while Morton was a respectable married man, steadily employed, who evidently enjoyed an excellent reputation and had no motive to deviate from the truth. If the verdict had hung only on the jury's appraisal of the trustworthiness of Morton and the defendant, a conviction would have been irresistible. But the People's case depended on the accuracy of Morton's identification; and no matter how well-intentioned a witness he may have been, there were circumstances that could raise real doubts as to whether he had selected the right man. The first unqualified identification took place almost a year after the robbery had been perpetrated. The description of the robber that Morton gave the police on the morning of the robbery differed sharply from the actual appearance of defendant. And the circumstances under which Morton was held up were hardly conducive to a searching scrutiny of the robber's countenance. So the working issue in this case is whether Morton made an honest mistake.

Defendant was the last of the three witnesses to testify. The prosecutor devoted most of his cross-examination (about twenty pages of the typewritten record) to defendant's alleged commission of the Britman and McEachin robberies. He asked the substance of the following question of defendant in several forms: "Q Now, DuByk, is it not a fact that at about 4:30 A.M. on March 2nd, 1952, you held up a taxicab driver named McEachin — that's M-c-E-A-C-H-I-N — and robbed him of thirty dollars on the corner of 172nd Street and Nelson Avenue?" He did not desist when he received the answer "No, sir"; but raked defendant with questions as to whether he had used a black automatic, whether he was employed at the time of this robbery, whether

he made his escape through the schoolyard, where he had been on that evening, and so on.

Similarly, the prosecutor did not accept the denial of the following question but belabored defendant with scores of questions about the Britman robbery: " Q As a matter of fact, DuByk, at about three A.M. on Monday, February 25th, 1952, were you not committing a robbery of a taxicab driver at Clinton Avenue between 172nd Street and Featherbed Lane at that time and date? "

In fact, the prosecutor cross-examined defendant at greater length and with greater vigor about each of these extraneous robberies than about the only robbery defendant was charged with in the indictment. And then, to top off his cross-examination, he asked the following question concerning Britman's visit to defendant's apartment with two policemen: " Q Isn't it a fact that just before Mrs. Weiss or Miss Weiss, opened the door to admit these police officers and this civilian, as you call him, that at the first sound you threw a black automatic under the bed? "

To repeat, the only inferences that can logically be drawn from the record are that Britman and McEachin could not identify defendant and there is not a suggestion — other than the prosecutor's — that defendant threw a black automatic under the bed on the occasion of Britman's visit with the policemen.

The question of how far a prosecutor may go in cross-examining a witness in an effort to weaken or destroy his credibility must rest largely in the sound discretion of the Trial Judge, but such discretion should be exercised with caution (*La Beau* v. *People*, 34 N. Y. 223; *Real* v. *People*, 42 N. Y. 270; *People* v. *Casey*, 72 N. Y. 393; *People* v. *Irving*, 95 N. Y. 541; *People* v. *Webster*, 139 N. Y. 73; *People* v. *Slover*, 232 N. Y. 264).

It is often difficult, in the stress and surge of a trial, for a trial judge to make an early diagnosis of the possible malignant spread of an examination addressed to a witness's credibility. " No impossible standards of perfection may be applied" (*People* v. *Malkin*, 250 N. Y. 185, 196). But in this case I believe the trial judge could have ascertained, when defense counsel made his initial objection, the impropriety of the questions contemplated by calling a bench conference out of hearing of the jury. In any event, in the exercise of sound discretion he should not have permitted the line of examination to proceed as far as it did once its drift became apparent.

There were early rumblings of the danger that the tenor of the examination, instead of affecting the credibility of defendant, might tend to establish in the minds of the jury critical facts in issue which the People had to prove in order to secure a conviction. The court must always be alert to this danger when a defendant takes the stand, even though the law is now well established that a defendant, just as any other witness, is subject to cross-examination as to past criminal, vicious and immoral acts (*People* v. *Casey*, 72 N. Y. 393, *supra*; *People* v. *Webster*, 139 N. Y. 73, *supra*; *People* v. *Jones*, 297 N. Y. 459). However, the potentiality " to bolster up a weak case, by probabilities based upon other transactions " (*People* v. *Crapo*, 76 N. Y. 288, 291) is usually strongest only when cross-examination is directed to the credibility of a defendant rather than of any other witness.

This potentiality is heightened when defendant, as here, is cross-examined as to crimes similar in every detail to the crime for which he is standing trial. Again, this feature, in and of itself, does not preclude inquiry (*People* v. *Sorge*, 301 N. Y. 198, *supra*, and cases therein cited p. 200). But the probative and

incriminating weight of linking a defendant with similar crimes is well recognized in the law of evidence. Such proof is admissible when it will tend to establish the identity of the person who committed the extraneous crimes as the same person who committed the crime charged in the indictment (*People* v. *Molineux,* 168 N. Y. 264, 313). The only real issue in this case is as to identity, since there is no doubt that Morton was held up and robbed. The question is whether defendant was the robber. Where the issues are thus narrowed down to one of identity, there is far greater danger in allowing cross-examination involving similar crimes than from inquiry into dissimilar crimes.

What was said in *People* v. *Malkin* (250 N. Y. 185, 192, *supra*) is therefore most apt here: " the question is not before us whether the People might otherwise have offered evidence of assaults committed on other occasions which would have been competent under the rule formulated in *People* v. *Molineux* (168 N. Y. 264). Then the defendants would have had the right to controvert such evidence." Here too defendant could deny, but not controvert. If his denials were faltering and unconvincing, because he was surprised and unprepared, the accusations and charges implicit in the prosecutor's tenacious questioning could be taken by the jury as proof of his commission of the two similar robberies. And if the jury believed he had committed the other two robberies, with a black automatic, all doubts created by Morton's vulnerable identification would be swept away. By cognate reasoning, questions tending to establish through cross-examination as to other crimes a predisposition or propensity on the part of the defendant to commit certain types of crime have been condemned (*People* v. *Zackowitz,* 254 N. Y. 192, 197; *People* v. *Nuzzo,* 294 N. Y. 227, 234; *People* v. *Bilanchuk,* 280 App. Div. 180, 186; *People* v. *Farricchia,* 266 App. Div. 667; *People* v. *Kress,* 284 N. Y. 452, 466).

In the setting of this case a trial judge must insist on strong assurances of the requirements enunciated in *People* v. *Sorge* (*supra*), before he should permit the introduction of impeaching testimony — namely, he must be assured that the questions have basis in fact and that they are asked by the District Attorney in good faith. Measuring good faith by the values of the street, there is no doubt of the prosecutor's good faith. Most likely he felt morally certain that defendant had committed the extraneous crimes — and probably, as hinted on argument, he had information dehors the record to strengthen this belief. As a practical matter, good faith within the contemplation of the *Sorge* case will usually equate with a showing that the questions have basis in fact. There is no such showing in this case — not even the minutes of a whispered bench conference. In this significant regard the instant case differs from the *Sorge* case, in which the District Attorney pressed the defendant from the contents of her signed statement.

Furthermore, the vice in the cross-examination under attack here does not rest only on the circumstance that there is no evidence in the record to support an inference that the challenged questions had any basis in fact. Such a showing is sometimes difficult, if not impossible, to make; and might prove a two-edged sword dangerous to a defendant.

But the deficiency in this case penetrates deeper than the failure to make an affirmative showing of the *bona fides* of the questioning. In this case a court must speculate on facts entirely outside the record to find a fulfilment of the requirements set forth in the *Sorge* opinion. The only inference that may be drawn from the evidence herein is that defendant did not commit the two

extraneous crimes about which he was pressed on cross-examination. The requisite inferences may not be distilled out of the confidence which over the years this court has come to repose in the District Attorney's office.

This confidence is widespread in the community and undoubtedly held by jurors. It poses the hazard of disarming jurors and diverting them from applying to a prosecutor's tactics the same shrewd and wholesome skepticism with which they view the conduct of a lawyer who does not enjoy the benefit of official title. In the instant case they may have reflected that if the District Attorney pressed defendant so closely about the two extraneous crimes he must have had good and sufficient reasons for so doing.

In his efforts to help the jury search out the truth in a criminal case a judge must often resort to a pragmatic balancing of the advantages to be gained and the dangers to be apprehended from a line of questioning directed at credibility. Where the questions promise no contribution but rather an obstruction to the search for the truth, and where they have no basis in fact, the exercise of sound discretion requires their exclusion.

At the outset of his cross-examination defendant admitted previous separate convictions of robbery in the third degree and of unlawful possession of a gun. He also testified about some youthful brushes with the law and about other immoral acts. At this point defendant had no shred of credibility left. To attack his veracity further was as needless a trial tactic as to call a character witness for Florence Nightingale. " The district attorney may not in fairness multiply questions as to acts of collateral misconduct when no purpose is served except to prejudice the jurors " (*People* v. *Slover*, 232 N. Y. 264, 268, *supra*).

The judgment of conviction should be reversed and a new trial ordered.

Cohn, J. P., Breitel and Rabin, JJ., concur in *Per Curiam* opinion; Botein, J., dissents and votes to reverse and order a new trial in opinion in which Bastow, J., concurs.

Judgment affirmed.