Chief Judge Desmond.
In June, 1958 when the alleged acts charged in this indictment were committed defendants Buckles and Kelly were detectives of the Narcotic Squad of the New York City Police Department and defendant-appellant Rosenfeld was a New York City lawyer. All three were convicted on count numbered 2 of the indictment which alleged that defendants Buckles and Kelly (and another detective who was acquitted of all charges) committed the crime of attempted extortion by trying to extort money from one Shimon Tamari by threatening to accuse him of a crime and which count further charged defendant Rosenfeld with having aided and abetted the others in this attempt. The trial at General Sessions lasted seven weeks. Appellate Division, First Department, unanimously affirmed'the conviction with an opinion which deals mainly with alleged prejudicial conduct of the Assistant District Attorney who tried the case. The Appellate Division concluded, however, that while some of the activities of the prosecutor were not justified they were not such as to deprive appellants of a fair trial. There is grave doubt of the validity of this conclusion. There is no doubt as to the sufficiency of the evidence.
Since the appellants do not argue inadequacy of proof, we can limit ourselves to a comparatively short summary of a very long record. The narrative starts in June, 1958. The theory of the prosecution was that from June 3 to June 21 all four of the defendants were conspiring to extort money from Shimon Tamari by threatening to accuse him of a crime involving narcotics. Testimony produced by the People showed that detectives Kelly and Buckles (and another detective named Powers not indicted), following up on information that one Michael Nichols was a marijuana vendor, went to Nichols’ apartment *294 on West 56th Street, Manhattan, got into the apartment, told Nichols that they were searching for a gmi and in the course of the search found or claimed to find some marijuana in the apartment. The officers found in the apartment and apparently took away with them a book kept by Nichols in which there were a number of names, presumably of customers of his, including the name and address of Shimon Tamari. While the officers were there Nichols was allowed to telephone to a woman named Maguire who was in Ohio. During that conversation Nichols told the Maguire woman to come home because he needed help and the officers told her that Nichols was going to jail. A friend of Nichols named Kraft came to the apartment while the officers were there and later the officers and Nichols and Kraft went to the latter’s apartment where the officers claimed to find some more marijuana. Kraft telephoned to defendant Rosenfeld who was said to be the lawyer for both Kraft and Nichols. Defendant attorney Rosenfeld came to the Kraft apartment. Rosenfeld talked privately with Nichols, then talked with the officers, then told Nichols that he would not be arrested provided he became an informer. Nichols gave Rosenfeld $300 allegedly for past services. It was the theory of the prosecution that the police officers had while in the apartment picked up Nichols’ address book containing among others the name and address of Shimon Tamari. When the Maguire woman came back to town she was asked by defendant Rosenfeld if she knew one Shimon Tamari and she replied that Tamari was a friend of Nichols.
Shimon Tamari testified that he had been buying marijuana from Nichols for some time before June, 1958 when Nichols sold Tamari a quantity of marijuana, some of which Tamari gave away and some of which he sold. On June 18, 1958 the detectives Buckles, Kelly and a third detective came to Tamari’s apartment and searched it. Some marijuana in a hiding place in the Tamari apartment was turned over to the officers by Mrs. Tamari. Tamari told the officers that he had bought the marijuana from Nichols. Detectives Buckles and another, according to Tamari, told the latter that they would forget the whole thing for $500 each and Tamari said he did not have that much money at the time. The officers then drove Tamari in their car to a bar. Defendant Buckles went into the bar, came out and *295 told Tamari to go into the bar and see the man who was to “ handle things ”. Tamari went into the bar and met defendant Bosenfeld whom he had never seen before. According to Tamari defendant Bosenfeld said that Tamari would have to bring to Bosenfeld’s office the next day $1,500 “ for Tamari ” and $1,000 “ for Nichols” and that the officers would never bother Tamari again. That same night Tamari and his wife spoke to a New York City lawyer as a result of which conference Tamari and the attorney went the next day to the New York County District Attorney’s office. At the District Attorney’s office Tamari was equipped with a hidden “Minifon” recorder which he turned on later when he went to Bosenfeld’s office.
According to Tamari, he and Bosenfeld had a long conversation in which Tamari said that he and his wife wanted to see the money passed directly to one of the police officers and Bosenfeld said the officers did not want anyone to see this and that everything would be all right. That afternoon Tamari telephoned Bosenfeld and in the course of the phone conversation Bosenfeld said that the officers insisted on using an intermediary but that the officers would not break their word. During this conversation an arrangement was made for Tamari to bring the money to Bosenfeld’s office the next day. On the next day Tamari was at Bosenfeld’s office with $1,500 in marked money but Tamari refused to give the money to Bosenfeld unless one of the officers was present. Later on that second day Tamari came to the place, saw Bosenfeld standing in front of the building, followed Bosenfeld down into the subway and again into the street where they hailed a cab and police officers who were observing nearby jumped into the cab and arrested Bosenfeld. Mrs. Tamari corroborated her husband and testimony which furnished some corroboration was given by others. The Minifon recordings were never read to the jury because the court held that they were unclear.
We will take up in the order of their importance several of the serious charges against the prosecution of misconduct or improprieties. The first of these concerns the recordings by a Minifon device secreted on Tamari’s body of conversations which Tamari had with the defendant lawyer Bosenfeld at the latter’s office on June 19 and 20. Those recorded conversations were never received in evidence. We have been furnished with *296 exhibits for identification 11 and 12 purporting to be the stenographic transcripts of the Minifon recordings and from reading those exhibits we learn that, while Tamari’s end of the conversations was recorded, the device got only a very little of what Rosenfeld said. The defense apparently never saw these transcripts and never objected to them. Reading them to the jury would have harmed defendants very little if at all but grave and unfair damage was done to defendants by the suggestions to the jury that these suppressed “ spools ” contained strong evidence against defendants. Tamari’s veracity was disputed and it was fatal to defendants to suggest to the jury that there was undisclosed corroboration of Tamari’s testimony. The prosecution’s several allusions to them in the presence of the jury and his several efforts to get them into evidence culminating in his references to them in summation must have been seriously damaging at least to defendant Rosenfeld and probably to all three defendants. At one point in the trial an investigator for the District Attorney’s office was called to the stand, apparently to put these Minifon recordings into evidence. During the discussion as to whether they were admissible the court announced, and defense counsel learned for the first time, that the witness a few days earlier in the Judge’s chambers had played the spools for the Judge, that the Judge had before him at the same time a transcript of what could be heard on the spools. The Judge on the basis of that preview announced that the ‘ ‘ recording is not sufficiently complete to justify its admission in evidence.” Counsel for defendant Rosenfeld then asked some questions about the entries on a file card which contained dates and other data concerning these recordings. Defense counsel offered this file card in evidence and the court held that so much of it could go into the record as related to these particular Minifon recordings. There was discussion between defense counsel and the prosecutor in the presence of the jury during the course of which the prosecutor made the surprising offer to withdraw his objection to this file card if defense counsel would withdraw their objection to the spools. In other words, the prosecutor offered to withdraw an objection to an exhibit provided defense attorney would stipulate to the introduction in evidence of the other exhibits which the court itself had held to be inadmissible because incomplete and unclear. The Trial Judge told counsel (and the *297 jury) that he had already excluded these reels as being incomplete and unclear and not audible. The court repeated that everything connected with these reels was out of the case.
When defendant Eosenfeld took the stand he gave testimony as to his version of the conversation at Bosenfeld’s office with Tamari which had been recorded. When cross-examining Eosenfeld the prosecutor asked whether Tamari had made certain statements to Eosenfeld during that same meeting and Eosenfeld denied these or denied recollection. Again the prosecutor offered these spools which on previous occasions had been positively rejected by the court as evidence. The prosecutor said in the presence of the jury that the distinctness and audibility of Tamari’s voice on the spools was so clear, etc., that he was offering them again. Defense objected and asked the court to direct the jury to disregard the offer and the court did so. Nonetheless, the prosecutor offered them again to show what Tamari said and he again asked the Judge to “ re-listen ” to them and to rule again. Later that day the Judge, in the presence of the jury, repeated that one of the voices was quite clear but not the other so he rejected them again. After all this the prosecutor told the jury on summation that to that conversation between Tamari and Eosenfeld there were not only two witnesses, that is, Eosenfeld and Tamari themselves, but “ a third witness ”, namely the Minifon. Defense counsel objected and there was discussion between counsel about it in the presence of the jury. If this series of incidents did not make up a gross impropriety, we do not know what could be so labeled. The repeated references to these excluded records culminating in their description by the prosecutor as “ a third witness ” was calculated to and could not fail to produce on the jury the impression that the defense counsel had kept from the jury a third and indisputable witness whose testimony would have been most damaging to the defendants.
The record justifies also the charge of appellants Buckles and Kelly that the prosecutor suggested to the jury that the Police Department had already found these defendants guilty. There are at least two cases (People v. Cioffi, 1 N Y 2d 70, 74, and People v. Malkin, 250 N. Y. 185) where this court has held it to be serious error to bring to the jury’s attention in a criminal case the fact that the charges on trial had already been deter *298 mined adversely to the defendant by another tribunal. The prosecutor here developed the fact of the suspension of these police officer defendants by his questioning of Deputy Police Inspector Shanley. First, he had Shanley describe his whole career on the police force over a period of 20 years, then emphatically and pointedly brought to the jury’s attention that Shanley had been promoted to the job of Deputy Inspector on June 23, 1958. He then asked Shanley whether his promotion was in part a result of the present case—in other words, whether Shanley was promoted for what he did in turning in these defendants. There was a sustained objection to this but it was particularly damaging because the prosecutor had been careful to bring out that the promotion was on June 23, 1958 which, as the jury knew, was just three days after Shanley had arrested the defendants in this case. Later on, the defendants took the stand and in cross-examining Buckles the prosecutor saw to it that the jury was informed that, while Patrolman Powers, who as noted above had been in on the original search of the Nichols apartment, was still a patrolman, Buckles was suspended. There was an objection, exception, and a motion for a mistrial which the court denied. Then the prosecutor returned to the subject by asking when Buckles was suspended and pressed this by asking whether Buckles had been engaged in police duties since June 21, 1958, that he now had a different job and that he had had no police duty since June, 1958 except to report in.
The same thing happened when Kelly took the stand and was cross-examined. The District Attorney started his cross-examination by asking Kelly whether he was “ presently ” a detective. Objection was overruled and the witness answered that he was not. Then to be sure that the jury understood this, the prosecutor asked what Kelly’s present job in the Police Department was. There was an objection and objection was overruled. Kelly replied that he was a patrolman. The prosecutor then asked him whether he was on active duty and Kelly said “ No ”. The prosecutor then asked Kelly if he had been suspended. Kelly answered “ Yes ”. The prosecutor then asked him if he had been suspended “ Ever since this incident ” and Kelly answered “ Tes ”. All this was objected to and all of the objec *299 tions were overruled. There was, too, an oblique or covert reference to this matter in the People’s summation.
The answer of the People’s brief to all this is that it was necessitated or justified by questions and answers on the direct testimony of Buckles and Kelly which gave the jury the impression that these men were still police officers. This was no excuse. Whatever brought it about, the prosecutor’s questioning showed and emphasized to the jury that these defendant police officers had been suspended from police duty. Perhaps some of the jurors knew, and perhaps we know, that suspension in such cases is automatic but as we pointed out in the Cioffi and Malkin cases {supra) the serious danger of such a showing is that it suggests to the jury that the Police Department itself considers these men guilty.
Appellants charge a number of other improprieties which we need not discuss.
In People v. Steinhardt (9 N Y 2d 267) we held, about a year ago, that despite very strong proof we would reverse a conviction where the introduction of extraneous matters, improper exchanges between counsel, added to many improper statements by a prosecutor and resulting in an inordinately long trial, required us to declare the whole trial a nullity and to order the case retried. The present case is different but worse. Steinhardt’s case was a sorry exhibition of silly wrangling and emphasis on extraneous matters by both counsel. This record shows continued efforts by the prosecutor to put into the record matter inadmissible and prejudicial. A pertinent authority is People v. Malkin (250 N. Y. 185, 194-197, supra) where the prosecutor indulged in somewhat similar tactics. The conclusion is irresistible that this prosecutor repeatedly called the jury’s attention to material excluded from evidence and also to suggest to the jury, particularly in the case of the Minifon recordings, that substantial proof of guilt existed which had been kept from the jury’s ears. In People v. Jackson (7 N Y 2d 142) we reversed a conviction because there was one such incident in that the District Attorney during summation told the jury that although one of his witnesses had failed to identify the defendant at the police lineup he (the prosecutor) knew the reason for this failure and would be happy to tell why after the trial was over.
*300 This is another case where ‘ * we could affirm only if we were to announce a doctrine that the fundamentals of a fair trial need not be respected if there is proof in the record to persuade ns of defendant’s guilt ” (People v. Mleczko, 298 N. Y. 153,163). We said in Mleczko, as we said nearly 50 years ago in People v. Marendi (213 N. Y. 600, 617, 619, 620), that we were not yet prepared to establish such a rule or announce such a doctrine. Unless we are prepared to do that now we must reverse this judgment.
The judgments should be reversed and a new trial ordered as to all three appellants.
Judge Dye, Fuld, Froessel, Van Voorhis, Burke and Foster concur.
Judgments reversed and a new trial ordered as to all three defendants.