(February 14, 1989)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WILFREDO MORALES, Appellant.—Judgment of the Supreme Court, Bronx County (Lawrence H. Bernstein, J.), rendered February 4, 1987, convicting defendant Wilfredo Morales, after jury trial, of robbery in the first degree and sentencing him to an indeterminate term of imprisonment of 4 to 12 years, unanimously reversed on the law and the facts and as a matter of discretion in the interest of justice, the conviction vacated and a new trial ordered.

Defendant was convicted of the July 27, 1985 armed robbery of a Shopwell supermarket on Boston Post Road in Bronx County.

The defendant argues, *inter alia,* that he was denied a fair trial when the prosecutor implied that the chief witness for the defense, a private first class in the Marine Corps who had been a store employee and was present during the robbery, was himself involved in the crime, had refused to submit to a polygraph examination and had been coerced into testifying by the defendant's brothers.

The People maintained at trial that the defendant and an unapprehended accomplice stole $5,000 at gunpoint from the Shopwell safe and then forced the night manager to accompany them when they drove away from the loading dock at the rear of the store. In addition to the night manager, Nelson Rosa, there were three other store employees who had contact

with the robbers during the robbery. These three employees were forced to lie face down on the floor during much of the incident.

Nelson Rosa, the chief witness for the prosecutor, was the only person to identify the defendant at trial. Some days after the robbery while discussing the description of the perpetrators and of their vehicle, the store's day manager indicated to Rosa that the description of one of the robbers and of their car fit that of the defendant who lived in the neighborhood and of a red Camaro which the defendant or one of his friends drove. Defense counsel elicited during his cross-examination of Rosa that this information was conveyed to detectives who obtained a photograph of the defendant and placed it in a photo array where it was identified by Rosa who, thereafter, picked the defendant out of a lineup. Two other store employees, one of whom was the defense witness Shawn Spraggs, failed to identify the defendant in this lineup.

The defense contended that this was a case of mistaken identity and called as a witness Shawn Spraggs, a private first class in the United States Marine Corps, who had been working at Shopwell as a stockboy on the night of the robbery and for three months prior thereto. Spraggs had attended high school nearby and had friends in the area. He testified that prior to the robbery he frequently saw the defendant in the neighborhood and that the defendant was a regular customer of the supermarket. Spraggs stated that he recognized the defendant by sight but did not know his name or anyone in his family. He further testified on direct examination that on the night of the robbery two Hispanic males came into the store and asked for a full carton of paper plates. He took the men to speak with the manager, the two men pulled guns and the robbery ensued. Spraggs testified unequivocally on direct examination and again on redirect that the defendant was not one of the robbers.

During his cross-examination of Mr. Spraggs, the Assistant District Attorney asked the following series of questions intended to discredit Spraggs by suggesting his complicity in the robbery.

"Q. And, incidentally, you quit Shopwell how long after this robbery, to join the Marines? In months? * * *

"A. A couple of months. * * *

"Q. And you took it on your own initiative to go to the night manager and to bring these two men to the night manager, didn't you Mr.—PFC Spraggs? * * *

"THE WITNESS: Yes. I did.

"Q. Do you know where the safes are in that store?

"A. Yes. * * *

"Q. So you knew which one they kept the big money in?

"A. No.

"Q. I see. And did you know who had the combination to to [sic] those, the safes with the money?

"A. I would assume the manager or who ever worked in the office.

"Q. You were familiar with the amount of people that come into the store, around 10:00 at night, aren't you, Mr. PFC Spraggs?

"A. Somewhat, yes. I'm familiar with them.

"Q. 10:00 at night is a slow time, isn't it?

"A. Yes.

"Q. And you knew that the night manager would have the combination to the safe with the big money Right [sic]?

"A. I assumed, yes. I never asked him. I assumed he did. * * *

"Q. Let me ask you something: Do you recall talking to Nelson Rosa right after he got back to the store, after the robbery?

"A. I recall talking to him, yes.

"Q. Do you recall telling Nelson Rosa that you knew one of the robbers, but you weren't going to cooperate with the police. Do you recall saying that to Nelson Rosa? * * *

"A. No. I don't.

"Q. You don't remember that at all, do you?

"A. I didn't say that.

"Q. You never said that to Nelson Rosa. Is that correct?

"A. That's correct. * * *

"Q. Did you refuse to take a polygraph, Mr. PFC Spraggs?

"MR. ROSS: Judge—

"THE COURT: Sustained. * * *

"Q. But the thing, the main thing is, Mr. PFC Spraggs, is that you showed him who the night manager was, didn't you?

"A. Yes. I did. * * *

"Q. You mentioned that not only is he the night manager, but he's the only one who got [sic] the combination to the safe. Did you?

"A. No I didn't tell him that."

The prosecutor further attacked Spraggs' credibility concerning his knowledge of guns as follows:

"Q. Let me get this straight. On July 27, 1985, how old were you?

"A. I was eighteen.

"Q. And at eighteen years old—did you grow up in the Bronx?

"A. Yes, I did.

"Q. At eighteen years old, you didn't know the difference between an automatic pistol and a revolver? Is that what you're telling this jury?

"A. Down to the details? No. I didn't.

"Q. Sir, my question was, did you know the difference between an automatic and a revolver?

"A. No I did not."

A witness may be interrogated upon cross-examination with respect to any immoral, vicious or criminal act which may affect his character and show him to be unworthy of belief, provided the cross-examiner questions in good faith and upon a reasonable basis in fact. *(People v Simpson,* 109 AD2d 461, 464 [1st Dept 1985], *appeal dismissed* 67 NY2d 1026; *see also,* Richardson, Evidence § 498 [Prince 10th ed]; Fisch, New York Evidence § 458 [2d ed].) "Although the District Attorney may, subject to the trial court's discretion, pursue such an inquiry in an effort to induce the witness to change his testimony * * * he may not through innuendo or suggestion attempt to persuade the jury to disbelieve the denial" *(People v Simpson, supra,* at 464; *People v Gottlieb,* 130 AD2d 202, 207-208 [1st Dept 1987]).

Spraggs' alleged statement to Rosa shortly after the crime that he knew one of the robbers and did not wish to get involved, as well as his familiarity with people in the neighborhood, may have provided a good-faith basis for the prosecutor's questioning of Spraggs as to his unwillingness to identify the defendant as one of the perpetrators and as to his failure to advise the police that the wrong person had been identified by Rosa after learning of the defendant's arrest. *(See, People v Dawson,* 50 NY2d 311, 321 [1980].) However, the record fails to disclose facts sufficient to form a good-faith basis for the more than 20 questions by which the prosecutor implied that Spraggs was a confederate of the armed robbers and that the theft was an inside job.

" '[W]here questions are permitted which are calculated by

suggestion of misconduct to prejudice the jury regardless of the answer given, then it may hardly be said that the error in permitting the questions is harmless. The rule that an answer elicited on cross-examination is conclusive affords little protection to an accused if the jury is induced to believe that it should act upon the assumption that the answer is untrue.' " *(People v Gottlieb,* 130 AD2d, *supra,* at 207-208, quoting *People v Malkin,* 250 NY 185, 197 [1928].)

Most inexcusable, however, is the Assistant District Attorney's question as to whether Spraggs had refused to take a polygraph test. *(People v Shedrick,* 66 NY2d 1015, 1018 [1985]; *People v Ricigliano,* 138 AD2d 751 [2d Dept 1988], *lv denied* 71 NY2d 1032 [1988].)* The effect of this question was not dissipated by the trial court's immediate sustaining of an objection to the question.

Further, while questioning Spraggs as to the guns used by the robbers, the prosecutor insinuated that since the witness was an 18 year old who lived in The Bronx, his claim that he did not know the difference between an automatic pistol and a revolver could not be believed. This was at best an impermissible appeal to community prejudice. *(See, People v Ortiz,* 116 AD2d 531 [1st Dept 1986].)* Similarly improper was the prosecutor's reference to the Bible in summation. *(People v Lewis,* 140 AD2d 714 [2d Dept 1988], *lv denied* 72 NY2d 920 [1988].)

The prosecutor's case hinged upon the identification testimony of Rosa and upon establishing the lack of credibility of defense witness Spraggs. While some of the noted improprieties of the prosecutor were not preserved for our review as a matter of law and the trial court did give certain curative instructions, the cumulative effect of all of these errors, particularly the inquiry regarding a polygraph test, necessitates a reversal and new trial. *(See, People v Pressley,* 93 AD2d 665, 670 [1983].)* Concur—Murphy, P. J., Carro, Asch, Rosenberger and Smith, JJ.